110    669
116    148

## J. P. GENTRY CO. *v.* MARGOLIUS & CO.

### (*Jackson:* April Term, 1903.)

1. **CONTRACTS.** Rescission of. To effectuate minds of parties must unite.

   It takes two to make a contract; and just as true, it takes two to do away with one, in the absence in the contract itself of a term allowing either party to retire at pleasure; and that would be a rope of sand, because it would lack the quality of legal obligement. (*Post, pp.* 674, 679.)

2. **SAME.** Renunciation of, by one party not legally efficient to cancel.

   A contract for the purchase and sale of property *in esse*, at a fixed price, to be delivered within a certain future time, is not rescinded, by the mere declaration made by the purchaser to the seller, before the expiration of the time in which the contract was to be executed, of his renunciation of the contract. (*Post, p.* 678.)

   Case cited and distinguished: Ault v. Dustin, 100 Tenn., 366.

3. **SAME.** Same. Declaration of renunciation by one may be withdrawn before assented to by other party.

   A declaration made by a purchaser of goods *in esse*, to the seller, before performance is due, of his renunciation of the contract of sale, amounts only to a declaration of an intention to breach the contract which may be retracted, and, if retracted before the seller assents to its abandonment by the purchaser, the contract remains in full force and effect. (*Post, p.* 679.)

   Case cited and distinguished: Ault v. Dustin, 100 Tenn., 366.

Gentry Co. v. Margolius Co.

**4.  SAME.  Wrongful attempt to rescind, effect of.**

A party wrongfully making a renunciation of a contract, entitled the other party, if he pleases, to agree "to the contract being put an end to," subject to the retention by him of his right to bring an action in respect to such wrongful rescission.  The other party may adopt such renunciation of the contract, by so acting upon it, as, in effect, to declare that he too treats the contract at an end, except for the purpose of bringing an action upon it for the damages sustained by him in consequence of such renunciation.  (*Post, pp.* 679-680.)

**5.  SAME.  Rescission of, for goods not in esse-different rule of construction applies.**

A contract for the purchase of, or an order for goods not *in esse,* but yet to be manufactured, is governed by a different rule of construction; in such case the purchaser may notify the manufacturer or seller not to proceed with the work, and the party so notified has no right to continue to manufacture, he can not go on and thereby increase the damages to which the purchaser has subjected himself by countermanding the order for the goods.  (*Post, p.* 680.)

Case cited:   Ault v. Dustin, 100 Tenn, 366.

**6.  SAME.  Measure of damages for breach of, for sale of goods in esse, deliverable during a certain month.**

In an action to recover for the breach of a contract for the sale of goods *in esse,* which were to have been delivered "during" a certain month, the measure of damages is the difference between the contract price and the market price at the place of delivery on the last day of the month.  (*Post, pp.* 681-682.)

Cases cited and approved:   Coffman v. Williams, 4 Heisk., 233; Paragon Refining Company v. Lee Brothers, 98 Tenn., 643-645; Cole v. Zucarello, 104 Tenn., 64.

Gentry Co. v. Margolius Co.

7. **CONTRACT.** Cancellation of. Measure of damages for breach. Case in judgment.

Defendants contracted with the complainants to deliver certain goods *in esse*, at a future day, that is "during" the month of August, but prior to this date, on account of defendants' failure to route the goods as directed by complainants, the latter notified defendants by two letters of the cancellation of the contract, which, however, defendants refused to accede to. A short time thereafter and before the time had arrived for the delivery of the goods, and the performance of the contract, complainants had a clerk, representing defendants, write them that, by an agreement with an agent of defendants, the contract had been revived, and that they were willing to accept the goods, to which defendants replied that they regarded the contract as canceled. During this correspondence between the parties, the goods covered by the contract had advanced in price. Defendants failed and refused to deliver the goods during the month of August as provided in the contract, insisting that said contract had been cancelled by complainants. Bill by complainants to recover damages for breach of contract.

*Held*: 1. That the minds of the parties did not unite as to the cancellation before complainants retracted their declared intention to renounce said contract, and as the goods to be delivered were *in esse*, the contract was never canceled.

2. That complainants were entitled to recover as damages the difference between the contract price and the market price at the place of delivery on the last day of the month.

---

FROM SHELBY.

---

Appeal from Chancery Court of Shelby County.— F. H. Heiskell, Chancellor.

SMITH & TREZEVANT, for J. P. Gentry Company.

MYERS & BANKS, for Margolius & Company.

———

MR. JUSTICE NEIL delivered the opinion of the Court.

The bill in this case was filed in the chancery court at Memphis on September 11, 1901, to recover for breach of contract to deliver to the complainant 5,000 bundles of cotton arrow ties, during August, 1901, at $1 per bundle.

The defendants do not deny making the contract, but claim that it was canceled by agreement of the parties.

The facts bearing upon this subject, so far as necessary to be stated, are as follows: The contract was made, as stated, on June 13, 1901, for the delivery of the 5,000 bundles of ties at the price stated, at any time during the month of August of the same year, at Memphis.

In order to properly understand what followed, it is necessary to state that there had been a prior contract, of date April 22, 1901, for 5,000 bundles of ties to be delivered f. o. b. Pittsburg. A controversy arose between the parties as to the routing of these ties, that is, those embraced in the April contract, with the result that the following correspondence ensued:

Margolius & Co. having failed to route the April ties as directed by complainants, the latter wrote, July 8,

Gentry Co. v. Margolius Co.

1901: "As you decline to comply with your contract, we hereby cancel all contracts with you."

This, of course, referred to the contract of June 13th, as well as that of April 22d.

On the same day, July 8th, defendants replied: "Our contracts are not subject cancellation; hence will not cancel."

On July 10th, complainants replied: "It is immaterial with us what you do. We will not receive or pay for any ties from you, and will have no transaction with you at all."

On July 15th, defendants replied: "We hereby tender you our delivery of ties you bought of us on all contracts, at same time stating for your information that we will pay you whatever lawful damages you would incur by our billing those ties f. o. b. Memphis instead of Pittsburg. We beg to state that you are not entitled to any railroad rebate of any kind, as we don't receive any money from any corporation or individual to induce us to make shipment over any particular line, nor do we receive any rebate of any kind on this shipment. Therefore, you will plainly see that you are not entitled to any reduction whatever. We beg further to state that in your letter of the 10th, you absolutely refused to complete your contract. You have also returned draft accompanying B—L—for your first shipment and contract. We ask that you give us no further trouble in this matter and wire us, so that we may forward draft

immediately, and that you will honor same, otherwise we will put the matter in our attorney's hands at once, and sue you for damages, including demurrage, storage, insurance, drayage, loss of interest on money, and other inconveniences, etc., and force you to take these ties. You will bear in mind that we were very indulgent regarding transaction of 1,000 rolls of bagging sent you, and this must be thanks for our leniency. Please reply at once as to what you propose doing."

Up to this time, July 15, 1901, it is clear there had been no cancellation. The complainant, it is true, insisted upon it, but the defendant as strongly declined to agree to it. It takes two to make a contract; and just as truly, it takes two to do away with one, in the absence in the contract itself of a term allowing either party to retire at pleasure; and that would be, not a bond, but a rope of sand, because it would lack the quality of legal obligement.

So, upon July 15th the contract was still standing.

Matters rested in this condition until July 20, 1901, when, with the knowledge and consent of the complainant, the following letter was addressed by Booker & Gentry (a brokerage firm that had been representing defendants in the city of Memphis) to the defendants, viz.: "Your Mr. Margolius called upon us this morning. . . .

"He saw Mr. Gentry, and arranged everything to his [Gentry's] satisfaction. He has arranged to ship 5,000 bundles to J. P. Gentry Company on your August contract at $1 per bundle, signed June 13th, which ends all

controversy as to the other July contract. These ties can be shipped in July if you wish or at any other time during the month of August. Regarding the other 2,000 bundles August for ourselves, you can ship them at any time after the first of August."

To this letter the defendants replied as follows, also addressed to Booker & Gentry, on July 23, 1901: "We have yours of the 20th inst. All the contracts between us having been canceled by your Mr. Gentry, we have sold the ties to other parties. We have incurred considerable loss in doing so, having had to send our salesman to Memphis and other points at great expense, and don't think we were treated right in this matter by you canceling these contracts. Had not the market rallied a little, you would have put us to great loss by your actions, and if we escape now without loss, it will certainly be by mere chance. You mentioned especially. that all contracts were canceled which therefore included the 2,000 sold to Booker & Gentry, as well as Gentry & Co. . . . The cancellation was for all ties, and the letter written us with this cancellation, was a very insulting epistle, and was not fit to be written to any business house of good standing. . . . In conclusion we beg to say, that our contracts are not made for the purchaser to cancel at will, and then take them up at will, especially when the material has advanced. We therefore do not wish to re-open this matter, and enter into new contracts."

This letter was shown by Mr. Booker to Mr. Gentry,

who was the leading spirit of J. P. Gentry Company, and the matter was discussed between them. Then, without referring to the foregoing letters at all, the complainant addressed the following to the defendants on July 27, 1901: "Your Mr. Margolius was here a few days ago, and requested us to allow our contract which you have with us for 5,000 bundles cotton ties, August shipment, to stand. We asked him to write out a new agreement in view of the fact that we had written that we would cancel the old one, and you replied refusing to do so; he stated that it was unnecessary to write a new agreement, but was only necessary for us to advise you of our acceptance, our willingness to take the ties on the old contract. This we had Mr. Booker to do in Mr. Margolius' presence, and also in the presence of Mr. G. S. Scruggs, of King, Scruggs & Co., of this city. After reviving the contract at Mr. Margolius' solicitation, and without request on our part, all of which was done in the presence of Mr. Scruggs, we sold the 5,000 bundles ties, and, on Mr. Margolius' return to our office during the day, we notified him in Mr. Scruggs' presence that we had sold the ties. We requested Mr. Booker to write you, stating that you could ship the ties at once, if you desired, with the understanding that same could be delivered either now, or during August. Of course, we prefer that you ship now, and should be glad to hear from you by return mail to this effect."

The defendants made no reply to this, and this closed the correspondence.

Gentry Co. v. Margolius Co.

It is impossible to read these letters without coming to the conclusion that the minds of the parties never met upon the subject of canceling the contract. At first the complainants asked to cancel, or insisted that they had the right to do so. The defendants refused to agree to this, and said that they would hold complainants to the contract. At the last, on July 20th, when the complainants caused the communication of that date to be sent to the defendants, the latter changed front, and said: "You have already canceled the contract."

All of the foregoing happened before the time fixed for delivery by the contract.

It is immaterial that, when the letter of July 20th was written, the complainants were under the seeming impression that their own prior communications, the letters of the 8th and 10th of July, had been legally efficient to put an end to the contract. The vital point is that, by virtue of the refusal of the defendants on the 15th of July to agree to a cancellation, the contract was still in force, and the complainants, by the communication of July 20th, through Booker & Gentry, brought to the attention of the defendants that they were still willing to accept the goods, and this was within the time fixed for delivery by the contract.

It is equally immaterial that the complainants believed that the legal efficiency of their act depended upon the conversation and agreement or understanding Gentry says he had with young Mr. Margolius, defendants' clerk, whereby he supposed an old contract previously

canceled had been revived; because, as a matter of fact and of law, there had been no cancellation, and the contract needed no reviving. The legal relation still subsisted.

Again, if we ignore wholly the transaction of July 20th, the result is the same. That is to say, the complainants had sought on the 8th and 10th of July to cancel the contract. The defendants had replied on the 15th of the same month, refusing to cancel. So the matter stood on that day with the contract in full force, and there was no subsequent agreement between the parties for a cancellation, none, indeed, even up to the time the present suit was brought.

Or, if we regard the transaction of July 20th, proven, as insisted upon by the complainants, the condition of the defendants is the same, because, if David Margolius had the power to make that agreement, there was a clear recognition by it of the binding force of the old contract, that is, of June 13, 1901; if David Margolius did not have the power, then matters stood just as they did on the 15th of July, 1901.

So from every point of view the defendants are bound upon the contract.

This case, in respect of the correspondence that passed between the parties, is very much like the case of *Ault* v. *Dustin*, 100 Tenn., 366, referred to by counsel. But there is a striking difference between the two cases, in this: In the present case the subject of negotiation and contract between the parties was property *in esse,* while

Gentry Co. v. Margolius Co.

in the case referred to the goods ordered were to be manufactured, and a considerable time was required for their manufacture. So it was held in that case that, while the correspondence indicated that no agreement as to rescission had been reached, yet there was an implied term in the contract, which required that sufficient time should be allowed for the manufacture of the goods before they should be ordered out, and, that inasmuch as this term had been violated by the complainant in that case, in that the defendants was not allowed sufficient time, the contract was breached by the complainant; the defendant was in no default in refusing to deliver the goods, and there could be no recovery.

In that case the principle applied in the present case was recognized, in the following language: "A refusal to perform a contract, made by a party at any time before the performance on his part is due, if not treated by the other party as a breach of the contract, is, in effect, merely the expression of an intention to breach the contract, and may be retracted," quoting with approval a passage from 2 Keene on Contracts. Again: "When one party assumes to renounce the contract— that is, by anticipation refuses to perform it—he thereby, so far as he is concerned, declares his intention then and there to rescind the contract. Such renunciation does not, of course, amount to a rescission of the contract, because one party to a contract cannot by himself rescind it, but, by wrongfully making such a renunciation of the contract, he entitles the other party, if he

pleases, to agree to the contract being put an end to, subject to the retention by him of his right to bring an action in respect of such wrongful rescission. The other party may adopt such renunciation of the contract, by so acting upon it, as, in effect, to declare that he too treats the contract as at an end, except for the purpose of bringing an action upon it for the damages sustained by him in consequence of such renunciation. . . . If he adopts the renunciation, the contract is at an end, except for the purpose of the action for such wrongful renunciation. If he does not wish to do so, he must wait for the arrival of the time when, in the ordinary course, a cause of action on the contract would arise"—quoting, with approval, from 1 Beach on Contracts, secs. 409, 411, 412.

It was held, however, that these rules were not controlling in that case, because the goods were not *in esse*, but were yet to be manufactured, and that, after one ordering goods has given the manufacturer notice not to proceed, the party so notified has no right to continue the manufacture; that while a contract is executory a party has the right to stop performance on the other side by an explicit direction to that effect, subjecting himself to such damages as will be compensation to the other party for being stopped in the performance of his work, and that the party thus forbidden cannot afterwards go on and thereby increase the damages, and then recover such damages.

But, as stated, the goods involved in the present case

Gentry Co. v. Margolius Co.

being *in esse* and no defense being made that they had. to be manufactured to fill the contract, the foregoing case does not control the present one.

From what has been already said, it follows that it is unnecessary to consider the question whether David Margolius was clothed with authority to make the agreement he is said to have made, and it is unnecessary to consider the credibility of the respective witnesses. However, we must say in this connection that, taking all the testimony as competent, and overruling all of the exceptions, the weight of the evidence seems to be in favor of the complainants as to the question of fact. It seems singular, to be sure, that David Margolius would in July make such a contract, when the price of ties was up so high; yet it must be remembered that the ties in question were for August delivery, and he might well have thought that during the month of August the price would drop back to $1 per bundle, especially in view of the fact that the advance was owing to a labor strike, which, of course, might be settled at any time.

But however this may be, the view previously expressed we deem conclusive of the case as to the question of liability.

This disposes of all the errors assigned, except the question as to the price that should be paid, that is, how much damages should be allowed; and in order to ascertain this, at what price should the ties be fixed on the last of August, 1901?

But before going to this subject, it should be premised

that the measure of damages in such a case—an executory contract for the sale of goods and failure to deliver—is the difference between the contract price and the market price at the time and place of delivery. *Coffman* v. *Williams,* 4 Heisk., 233; *Cole* v. *Zucarello,* 104 Tenn., 64; 56 S. W., 850, and cases cited.

The date of shipment fixed in the contract was "during the month of August, 1901." That gave the seller the whole of the month to make delivery in, and the purchaser could not demand delivery before the last day. Accordingly the price on that day must determine the rights of the parties, and the difference between the contract price and the price on that day in Memphis, the place of delivery, must show the amount of damages sustained by the complainant. *Paragon Refining Co.* v. *Lee Bros.,* 98 Tenn., 643-645, 41 S. W., 362; Mecham on Sales, sec. 1747.

No one undertakes to fix the price, precisely, on the last day of the month. Mr. J. P. Gentry says he sold ties during the month—not during the whole month, as we understand him—but at some time during the month, at $1.30. Mr. Levy Joy says he sold ties at from $1.25 to $1.27 "from the 10th of August on throughout the month." We have carefully read all the testimony, and we think this the most reliable, and the price fixed should be an average between the two figures. So we fix the price at $1.26½.

The complainant is entitled to recover the difference between $1 and $1.26½ or the sum which will be pro-

Gentry Co. v. Margolius Co.

duced by multiplying 5,000 by 26½ cents, together with four-fifths of the costs; the defendants will recover of complainants one-fifth of the costs.

There is no necessity for any order of reference to the master, as suggested by defendants.   The testimony showing the market price at the time and place of delivery, and the contract showing the price at which the property was sold, it is a mere matter of calculation.

Let the decree of the chancellor be modified and affirmed, as just indicated.