# CHARLES WILLIAM AKERS v. J. B. SEDBERRY, Inc., et al.
# WILLIAM GAMBILL WHITSITT v. J. B. SEDBERRY, Inc., et al.—286 S. W. (2d) 617.

Middle Section, at Nashville. September 9, 1955.

Petition for Certiorari denied by Supreme Court, February 3, 1956.

634

Harry Phillips, of Nashville, and Dave A. Alexander, of Franklin, for J. B. Sedberry, Inc., and Mrs. M. B. Sedberry, plaintiffs in error.

Roy A. Miles, and John J. Hooker, both of Nashville, for Charles William Akers and William Gambill Whitsitt, defendants in error.

FELTS, J.  These two consolidated causes are before us upon a writ of error sued out by J. B. Sedberry, Inc., and Mrs. M. B. Sedberry, defendants below, to review a decree of the Chancery Court, awarding a recovery against them in favor of each of the complainants, Charles William Akers and William Gambill Whitsitt, for damages for breach of a contract of employment.

The principal question presented is whether complainants resigned their employment, or were wrongfully discharged by defendants; and if there was a breach of contract for which complainants are entitled to recover, there are some further questions as to the measure or extent of the recovery.

J. B. Sedberry, Inc., was a Tennessee corporation with its principal place of business at Franklin, Tennessee. Mrs. M. B. Sedberry owned practically all of its stock and was its president and in active charge of its affairs. It was engaged in the business of distributing "Jay Bee" hammer mills, which were manufactured for it under con-

tract by Jay Bee Manufacturing Company, a Texas Corporation, whose plant was in Tyler, Texas, and whose capital stock was owned principally by L. M. Glasgow and B. G. Byars.

On July 1, 1947, J. B. Sedberry, Inc., by written contract, employed complainant Akers as Chief Engineer for a term of five years at a salary of $12,000 per year, payable $1,000 per month, plus 1% of its net profits for the first year, 2% the second, 3% the third, 4% the fourth, and 5% the fifth year. His duties were to carry on research for his employer, and to see that the Jay Bee Manufacturing Company, Tyler, Texas, manufactured the mills and parts according to proper specifications. Mrs. M. B. Sedberry guaranteed the employer's performance of this contract.

On August 1, 1947, J. B. Sedberry, Inc., by written contract, employed complainant Whitsitt as Assistant Chief Engineer for a term of five years at a salary of $7,200 per year, payable $600 per month, plus 1% of the corporation's net profits for the first year, 2% for the second, 3% for the third, 4% for the fourth, and 5% for the fifth year. His duties were to assist in the work done by the Chief Engineer. Mrs. M. B. Sedberry guaranteed the employer's performance of the contract.

Under Mrs. Sedberry's instructions, Akers and Whitsitt moved to Tyler, Texas, began performing their contract duties in the plant of the Jay Bee Manufacturing Company, continued working there, and were paid under the contracts until October 1, 1950, when they ceased work, under circumstances hereafter stated.

In 1947, when these employment contracts were made, Mrs. Sedberry owned no stock in the Jay Bee Manufacturing Company. In 1948 she purchased the shares of stock in this company which were owned by the Glasgow in-

terests, and in 1949 she purchased the 750 shares owned by her brother, B. G. Byars, and gave him her note therefor in the sum of $157,333.93, pledging the 750 shares with him as collateral to her note.

Glasgow had been general manager of the Jay Bee Manufacturing Company, but when he sold his stock, he was succeeded by A. M. Sorenson as manager. There soon developed considerable friction between Sorenson and complainants Akers and Whitsitt. The Jay Bee Manufacturing Company owed large sums to the Tyler State Bank & Trust Co.; and the bank's officers, fearing the company might fail under Sorenson's management, began talking to Akers and Whitsitt about the company's financial difficulties.

One of the bank's vice-presidents, J. Harold Stringer, made a trip to Franklin to see Mrs. Sedberry about the company's indebtedness to the bank. He told her that they could not get along with Sorenson and did not agree with the way he was managing the company's affairs. Mrs. Sedberry asked Stringer as soon as he got back to Tyler to see Akers and Whitsitt and discuss with them plans for the refinancing and the operation of the company; and thereafter the bank's officers had a number of conferences with Akers and Whitsitt about these matters.

While these matters were pending, Akers and Whitsitt flew to Nashville and went to Franklin to talk with Mrs. Sedberry about them. They had a conference with her at her office on Friday, September 29, 1950, lasting from 9:30 a. m. until 4:30 p. m. As they had come unannounced, and unknown to Sorenson, they felt Mrs. Sedberry might mistrust them; and at the outset, to show their good faith, they offered to resign, but she did not accept their offer,

Instead, she proceeded with them in discussing the operation and refinancing of the business.

Testifying about this conference, Akers said that, at the very beginning, to show their good faith, he told Mrs. Sedberry that they would offer their resignations on a ninety-day notice, provided they were paid according to the contract for that period; that she pushed the offers aside—"would not accept them", but went into a full discussion of the business; that nothing was thereafter said about the offers to resign; and that they spent the whole day discussing the business, Akers making notes of things she instructed him to do when he got back to Texas.

Whitsitt testified that at the beginning of the meeting Akers stated the position for both of them, and told Mrs. Sedberry, as evidence of their good faith, "we would resign with ninety-days notice if she paid us the monies that she owed us to that date, and on the other hand, if she did not accept that resignation, we would carry forth the rest of our business." He said that she did not accept the offer, but proceeded with the business, and nothing further was said about resigning.

Mrs. Sedberry testified that Akers and Whitsitt came in and "offered their resignations"; that they said they could not work with Sorenson and did not believe the bank would go along with him; and that "they said if it would be of any help to the organization they would be glad to tender their resignation and pay them what was due them." She further said that she "did not accept the resignation", that she "felt it necessary to contact Mr. Sorenson and give consideration to the resignation offer." But she said nothing to complainants about taking the offer under consideration.

On cross-examination she said that in the offer to resign

"no mention was made of any ninety-day notice". Asked what response she made to the offer she said, "I treated it rather casually because I had to give it some thought and had to contact Mr. Sorenson." She further said she excused herself from the conference with complainants, went to another room, tried to telephone Sorenson in Tyler, Texas, but was unable to locate him.

She then resumed the conference, nothing further was said about the offers to resign, nothing was said by her to indicate that she thought the offers were left open or held under consideration by her. But the discussion proceeded as if the offers had not been made. She discussed with complainants future plans for refinancing and operating the business, giving them instructions, and Akers making notes of them.

Following the conference, complainants, upon Mrs. Sedberry's request, flew back to Texas to proceed to carry out her instructions. On the way back, and while in Nashville, Friday evening, Akers telephoned her in Franklin to tell her that he had just learned that the bank had sued both the companies and process had been served that day. On the next morning, September 30, Akers had a conference with the bank officials about the refinancing of the company, the results of which he reported to Mrs. Sedberry by long-distance telephone conversation that day.

On Monday, October 2, 1950, Mrs. Sedberry sent to complainants similar telegrams, signed by "J. B. Sedberry, Inc., by M. B. Sedberry, President", stating that their resignations were accepted, effective immediately. We quote the telegram to Akers, omitting the formal parts:

"Account present unsettled conditions which you so fully are aware we accept your kind offer of

resignation effective immediately. Please discontinue as of today with everyone employed in Sedberry, Inc., Engineering Department, discontinuing all expenses in this department writing.''

While this said she was ''writing'', she did not write. Akers wrote her, but held up sending his letter, at the request of her brother, Mr. Byars, who was one of the officers of the bank in Tyler, Texas. Akers later rewrote practically the same letter and mailed it to her on October 16, 1950. Whitsitt also sent her a similar letter on the same day.

In his letter, Akers said that he was amazed to get her telegram, and called her attention to the fact that no offer to resign by him was open or outstanding when she sent the telegram; that while he had made a conditional offer to resign at their conference on September 29, she had immediately rejected the offer, and had discussed plans for the business and had instructed him and Whitsitt as to things she wanted them to do in the business on their return to Tyler.

This letter further stated that Akers was expecting to be paid according to the terms of his contract until he could find other employment that would pay him as much income as that provided in his contract, and that if he had to accept a position with less income, he would expect to be paid the difference, or whatever losses he suffered by her breach of the contract. Whitsitt's letter contained a similar statement of his position.

On November 10, 1950, Mrs. Sedberry wrote a letter addressed to both Akers and Whitsitt in which she said that ''no one deplored the action taken more than the writer'', but she did not recede from her position as expressed in the telegram. She stated her contention that the offers to resign had been without condition; and

though she also said she would like to make an amicable settlement, no settlement was made.

As it takes two to make a contract, it takes two to unmake it. It cannot be changed or ended by one alone, but only by mutual assent of both parties. A contract of employment for a fixed period may be terminated by the employee's offer to resign, provided such offer is duly accepted by the employer. Gentry Co. v. Margolius, 110 Tenn. 669, 674, 75 S. W. 959; Balderacchi v. Ruth, 36 Tenn. App. 421, 424, 256 S. W. (2d) 390, 391.

An employee's tender of his resignation, being a mere offer is, of course, not binding until it has been accepted by the employer. Such offer must be accepted according to its terms and within the time fixed. The matter is governed by the same rules as govern the formation of contracts. Nesbit v. Giblin, 96 Neb. 369, 148 N. W. 138, L. R. A. 1915D, 477, Ann. Cas. 1916A, 1008; 1 Labatt's Master & Servant (2d ed.) Section 181; Note, Ann. Cas. 1916A, 1011, 1012.

An offer may be terminated in a number of ways, as, for example, where it is rejected by the offeree, or where it is not accepted by him within the time fixed, or, if no time is fixed, within a reasonable time. An offer terminated in either of these ways ceases to exist and cannot thereafter be accepted. 1 Williston on Contracts (1936), Secs. 50A, 51, 53, 54; 1 Corbin on Contracts (1950), Secs. 35, 36; 1 Rest., Contracts, Secs. 35, 40.

The question what is a reasonable time, where no time is fixed, is a question of fact, depending on the nature of the contract proposed, the usages of business and other circumstances of the case. Ordinarily, an offer made by one to another in a face to face conversation is deemed to continue only to the close of their conversation, and cannot be accepted thereafter.

The rule is illustrated by Restatement of Contracts, Section 40, illustration 2, as follows,.

"2. While A and B are engaged in conversation, A makes B an offer to which B then makes no reply, but a few hours later meeting A again, B states that he accepts the offer. There is no contract unless the offer or the surrounding circumstances indicate that the offer is intended to continue beyond the immediate conversation."

In Mactier's Adm'rs v. Frith, 1830, 6 Wend. N. Y., 103, 114, 21 Am. Dec. 262, 268, the rule was stated as follows:

"Although the will of the party making the offer may precede that of the party accepting, yet it must continue down to the time of the acceptance. Where parties are together chaffering about an article of merchandise and one expresses a present willingness to accept of certain terms, that willingness is supposed to continue, unless it is revoked, to the close of their interview and negotiation on the same subject, and if during this time the other party says he will take the article on the terms proposed, the bargain is thereby closed. Pothier Traite du Contrat de Vente, p. 1, sec. 2, art. 3, no. 31."

Professor Williston says:

"A reasonable time for the acceptance of most offers made in conversation will not extend beyond the time of the conversation unless special words or circumstances indicate an intention on the part of the offeror that it shall do so." Williston on Contracts (1938), Section 54.

Professor Corbin says:

"When two negotiating parties are in each other's presence, and one makes an offer to the other without indicating any time for acceptance, the inference

that will ordinarily be drawn by the other party is that an answer is expected at once. * * * If, when the first reply is not an acceptance, the offeror turns away in silence, the proper inference is that the offer is no longer open to acceptance.'' 1 Corbin on Contracts (1950), Section 36, p. 111.

The only offer by Akers and Whitsitt to resign was the offer made by them in their conversation with Mrs. Sedberry. They made that offer at the outset, and on the evidence it seems clear that they expected an answer at once. Certainly, there is nothing in the evidence to show that they intended the offer to continue beyond that conversation; and on the above authorities, we think the offer did not continue beyond that meeting.

■ Indeed, it did not last that long, in our opinion, but was terminated by Mrs. Sedberry's rejection of it very early in that meeting. While she did not expressly reject it, and while she may have intended, as she says, to take the offer under consideration, she did not disclose such an intent to complainants; but, by her conduct, led them to believe she rejected the offer, brushed it aside, and proceeded with the discussion as if it had not been made.

''An offer is rejected when the offeror is justified in inferring from the words or conduct of the offeree that the offeree intends not to accept the offer or to take it under further advisement (Rest. Contracts sec. 36).'' 1 Williston on Contracts, Section 51.

■ So, we agree with the Trial Judge that when defendants sent the telegrams, undertaking to accept offers of complainants to resign, there was no such offer in existence; and that this attempt of defendants to terminate their contract was unlawful and constituted a breach for which they are liable to complainants. Nesbit

v. Giblin, supra; Brady v. Oliver, 125 Tenn. 595, 147 S. W. 1135, 41 L. R. A., N. S., 60, Ann. Cas. 1913C, 376; Church of Christ Home For Aged, Inc. v. Nashville Trust Co., 184 Tenn. 629, 642, 202 S. W. (2d) 178, 183; Lazarov v. Nunnally, 188 Tenn. 145, 149, 217 S. W. (2d) 11.

█ The measure of recovery by each complainant is the salary and the percentages of the profits fixed in his contract during the unexpired part of the term of employment, less what he might, by due diligence, earn in some other employment. Godson v. MacFadden, 162 Tenn. 528, 531, 39 S. W. (2d) 287.

The Chancellor allowed Akers a recovery of $17,927.75, and Whitsitt a recovery of $4,200 (the salary of each less what he earned), and allowed each of them a recovery of 4% of J. B. Sedberry, Inc.'s net profits, before taxes, from October 1, 1950, to June 30, 1951, and 5% of such profits from June 30, 1951, to the expiration date of their respective contracts; but the amount of such profits not appearing in the proof, the Chancellor referred this matter to a Special Master for proof and a report.

Defendants contend that if complainants are entitled to a recovery for breach of contract, the Chancellor erred in allowing them the contract percentages of the profits of J. B. Sedberry, Inc., without taking into account the losses of the Jay Bee Manufacturing Company of Tyler, Texas. It is urged that J. B. Sedberry, Inc. was the parent and Jay Bee Manufacturing Company the subsidiary, and that any loss of the subsidiary was really a loss of the parent and should be deducted in ascertaining the profits of the parent.

█ We cannot follow this argument. The contracts themselves fixed the rule for measuring the recovery. Black v. Love & Amos Coal Co., 30 Tenn. App. 377, 383, 206 S. W. (2d) 432. They must be read as of the time

they were made. At that time J. B. Sedberry, Inc. owned no interest in the other corporation. The parties could. not then have contemplated any such deduction as that now claimed. Nor could they have foreseen any parent and subsidiary relation such as is alleged to have later arisen between the two corporations.

Moreover, we find no satisfactory proof of any such relation. It is true Mrs. Sedberry said she acquired the Jay Bee Manufacturing Company's stock—bought the shares of Glasgow in 1948 and the shares of Byars in 1949, and transferred all of them to J. B. Sedberry, Inc. But her cross-examination, when asked if she had not pledged that 750 shares to Byars, she said, "Yes sir, but there was new stock issued. The old stock was—you see, there was a new capital structure set up—I just simply would have to get the record."

There was, however, no proof as to what this new capital structure was, or whether any of the capital stock of the Jay Bee Manufacturing Company was owned by J. B. Sedberry, Inc. during the period in question. Nor was there any proof that J. B. Sedberry, Inc., as parent corporation, dominated or controlled the Jay Bee Manufacturing Company of Tyler, Texas, as its subsidiary.

Finally, defendants contend that if complainants are entitled to any recovery at all, such recovery should have been limited to the ninety-day period from and after October 2, 1950, because complainants themselves admitted that they had offered to resign upon ninety days notice with pay for that period.

The answer to this contention is that their offer to resign on ninety days notice was not accepted, but had terminated, and there was no offer in existence when Mrs. Sedberry undertook to accept their offers of resignation. Such attempt by defendants to terminate their contract

was unlawful and was a breach for which they become liable for the measure of recovery as above stated.

Complainants assign error insisting that the Chancellor should have allowed them interest on the amounts of the recoveries from the several dates of their maturity. There is no merit in this assignment. The claims for damages under the contracts were not "liquidated and settled accounts" and did not draw interest under the statute, Code, Sec. 7305. Nor did the Chancellor abuse his discretion in disallowing interest. Tennessee Fertilizer Co. v. International Agr. Corp., 146 Tenn. 451, 473, 243 S. W. 81; Third Nat. Bank v. American Equitable Ins. Co. of N. Y., 27 Tenn. App. 249, 277, 178 S. W. (2d) 915, and cases there cited.

All of the assignments of error are overruled and the decree of the Chancellor is affirmed. Decrees will be entered here for complainants for the amount of the decrees below with interest. The costs are adjudged against defendants and the sureties on their cost bond. The causes are remanded to the Chancery Court for further proceedings not inconsistent with this opinion.

Hickerson and Shriver, JJ., concur.