F. M. RUSSOM, individually, and d/b/a Russom Transports, and Sidney Ray Aldy, individually and each for the use and benefit of Eugene Plunkett and in his own behalf, Plaintiffs-Appellants,

v.

INSURANCE COMPANY OF NORTH AMERICA, Defendant-Appellee.

No. 18891.

United States Court of Appeals, Sixth Circuit.

Feb. 13, 1970.

Paul W. Denton, Memphis, Tenn., for plaintiffs-appellants; Walter Buford, Memphis, Tenn., on the brief.

Thomas F. Johnston, Memphis, Tenn., for defendant-appellee; Armstrong, Allen, Braden, Goodman, McBride & Prewitt, Memphis, Tenn., of counsel.

Before O'SULLIVAN, EDWARDS and CELEBREZZE, Circuit Judges.

O'SULLIVAN, Circuit Judge.

We here consider the appeal of plaintiffs, F. M. Russom, individually, and d/b/a Russom Transports, and Sidney Ray Aldy, individually and each for the use and benefit of Eugene Plunkett, and Eugene Plunkett in his own behalf, from

a judgment dismissing the said plaintiffs' suit against defendant-appellant, Insurance Company of North America. It will aid clarity if we talk of Russom on one side and INA and its assured, Wesson Oil Division of Hunt Foods Industries, Inc., (Wesson Oil) on the other, as the adversaries in this lawsuit.

The basic question is whether INA had, by its policy issued to Wesson Oil, insured the liability of Russom arising from the death of a minor son of Eugene Plunkett, struck by a tractor and trailer then being operated by Russom's driver Ray Aldy, in the carriage of oil for Wesson Oil. Resolution of this question depends upon whether a lease agreement between Russom and Wesson Oil, made January 22, 1965, and identified at trial as Exhibit 1, was in force on June 21, 1966, the date of the fatal injury to Plunkett's son. Such agreement required Wesson Oil, as lessee, to carry "Cargo and Liability" insurance upon the leased vehicles. In turn, we construe INA's policy with Wesson Oil to mean that INA agreed to protect Wesson Oil against such contractual assumption of liability if the January 22, 1965, lease agreement was in force on June 21, 1966.

Following the June 21, 1966, accident, the father of the deceased Plunkett boy brought suit against Russom and Aldy in a state court of Tennessee. Defense of this suit was tendered to, and refused by, INA. Russom defended the suit through counsel employed by him. Trial resulted in a verdict and judgment for plaintiff Eugene Plunkett in the amount of $17,-500. INA refused to satisfy the judgment and this lawsuit followed.

The District Judge, resolving mixed questions of law and fact, found that Exhibit 1, the January 22, 1965, agreement between Russom and Wesson Oil, was not in existence on the date of the accident. He arrived at this conclusion by construing a lease executed in February or March, 1965, and identified at trial as Exhibit 2, as a cancellation of the lease of January 22, 1965. We are of the opinion that the District Judge, to whom the case was tried, was wrong in the law

applied and clearly erroneous in his factual findings.

We accordingly reverse.

In the year 1964, F. M. Russom was a smalltime trucker in Memphis, Tennessee, characterized, correctly we assume, by the District Judge as a "wildcatter". He apparently was not certificated by the Interstate Commerce Commission to carry on the business of hauling in interstate commerce. Beginning in July of 1964, he started hauling oil for Wessson Oil within the City of Memphis and environs. These hauls were generally what were known as short-hauls, picking up oil from suppliers of Wesson and delivering it to the latter's plant, also in the City of Memphis. The oil so delivered was carried in a 1955 model Trailmobile Tank Trailer owned by Russom and pulled, as a rule by a 1959 Mack Tractor also owned by Russom. However, there were times when, due to breakdowns of Russom's tractor, the Trailmobile Tanker was connected to a different tractor owned by Russom. Such haulage would be arranged by calls to Russom from Wesson Oil, notifying him where the desired load was to be picked up and delivered. Initially there was no written contract covering this relationship between Russom and Wesson Oil. Russom's charge for hauling in the City of Memphis, a *short-haul*, was five and one-half cents *per hundred weight* of oil. Occasionally he went out of Memphis—not farther than 150 miles—to pick up oil, and for these hauls Russom charged a higher rate, but also on a weight basis. All such carriage was considered shorthaul. On the other hand, the tariff generally charged in the industry for long-haul runs was computed on a *per mile traveled* basis. In January, 1965, it was decided that, in view of Russom's vehicles occasionally going beyond the limits of Memphis in hauling oil for Wesson, such equipment should be leased to Wesson; otherwise the hauls outside of Memphis would require an ICC certificate.

On January 22, 1965, the critical agreement here involved—Exhibit 1—

was prepared for Russom by another "wildcatter". It was executed by Russom and, for Wesson Oil, by its then Traffic Manager, M. L. Butt. Russom was described as lessor and Wesson Oil was described as lessee. After reciting that the lessor was leasing to lessee two motor vehicles—a 1959 Mack Tractor (admittedly misdescribed in the case as a 1958 tractor) and a 1955 Trailmobile— the following provisions were set out:

"1. The rental period of this lease shall be for thirty (36) six months commencing on the 22 day of *Jan. 1965* unless sooner terminated automatically by the giving of written notice by either of the parties to the other party of their desire to cancel this lease.

"2. The lessee shall carry Cargo and Liability Insurance and otherwise assumes all responsibility for the due care and safeguarding of the cargo being transported in the leased vehicle.

"3. The lessor shall pay all expenses for the equipment and provide fuel and oil used by the equipment under this lease, and assumes all road and fuel taxes.

"4. The lessor shall pay all tolls charged by toll bridges and turnpike officials."

The lease, Exhibit 1, was evidently prepared by filling in a mimeographed form entitled "Motor Equipment Lease Agreement"; the agreement that the lessee was to provide Cargo and Liability Insurance appears to be part of the mimeographed form. The rates or tariffs to be charged were not set out, but were agreed upon. It is undisputed that the rate or tariff charged by Russom at the time of execution of the lease, Exhibit 1, was at a short-haul, per hundred weight rate, and that such short-haul rate continued until the relationship between Russom and Wesson Oil was finally terminated near the end of 1966.

Some time in February or March of 1965 two further leases between Russom and Wesson Oil were prepared by an attorney employed for the purpose. One of these leases, Exhibit 2, was executed by

Russom and by Butt for Wesson Oil. Another lease covering short-hauls was prepared at that time by this attorney, but it was never executed because Exhibit 1, the January 22, 1965, lease was already in existence to cover short hauls. While the *long-haul* lease, Exhibit 2, was executed in February or March of 1965, it was back dated to January 1, 1965. This lease covered two Mack Tractors, a 1959 and a 1960 model. One of these tractors, the 1959 model was the same tractor that was mentioned in the January 22, 1965, lease, but the Trailmobile covered by the earlier lease and which was used exclusively for short-hauling Wesson Oil cargoes, was not covered.

At the close of proofs, the District Judge announced his decision from the bench. The following are the critical findings thereof:

"The Court finds that Trial Exhibit 1, which is entitled a lease agreement and dated January 22, 1965, was executed before the instrument which is Trial Exhibit 2, dated January 1, 1965. The proof supports the fact that the prior dated agreement was, in fact, prepared and executed subsequent to January 22, 1965."

\* \* \* \* \* \*

"The Court further finds that the purpose of the lease of January 22, the short form lease, was to thwart and circumvent the Interstate Commerce Commission laws and regulations. The proof does not support that the motivating purpose for this agreement was liability insurance protection from Hunt Foods to Mr. Russom.

"Now, the Court is of the opinion that the proof supports that Trial Exhibit 2, the long form lease was, in fact, cancelled by mutual agreement as evidenced by Trial Exhibit 4. Thereby, no rights of the plaintiffs arise by virtue of the long form lease. Now, this addresses the Court to the importance of Trial Exhibit 1, or the short form lease. There are several reasons, the proof supports several factors, that kill the validity of this lease.

"In the first place the essential elements of a lease are; the thing, the price, and the consent.

"Trial Exhibit 1, or the short form lease, makes no reference to price. It does not even recite that the price will be the established price, or one-half cent off the established price in the area.

"The second point which the Court feels is a factor, is that the second lease in time cancelled the first lease because it was all inclusive, and it was at least partially for the same vehicle.

"Now, there is a big difference in the long form lease and the short form lease. The long form lease goes into great detail about possession, control services to be exchanged, and other phases of the lease. Mr. Russom testified that if it had been followed in practice it would have made a significant difference in determining where the vehicle would have been stored and the other factors which would have made the control and possession on the part of Hunt Foods very complete. When the parties executed the all inclusive lease for the same tractor *whether you call it by operation of the law or otherwise, they cancelled the prior lease in time.* Now, I am not unaware of the fact that the Trailmobile tank trailer was not mentioned by the second lease in time.

"The cancellation is further fortified by the fact that the parties expressly back dated the second lease prior to the execution of the first lease in time.

"Now, the third factor pertaining to this lease which *gives the Court the most concern is this lease, namely the one dated January 22, 1965, is that it is against public policy.* This whole problem addresses itself to an area with which the Interstate Commerce Commission has been strongly concerned. Under the ICC regulations and the law, as a general rule a party who owns his own vehicle does not have to comply with all of the regulations when he travels in interstate in

the shipment of his own product. Now, "Wild-catters" in recent years have come up with the common subterfuge of leasing that truck to a company like Hunt Foods. They can always give a better price. They purport to lease it so that will be the company's vehicle. Under the regulations and practices, and I am sure Mr. Butt and Mr. Russom knew this, it is illegal unless a sufficient amount of control goes with the vehicle, who employs the driver, who has the right to control when the driver will make the trip, what vehicle he uses. Obviously in this case Mr. Russom had the control because he told his driver to take, not the vehicle that was in the lease, but another vehicle which was exclusively leased to another customer.

\*　\*　\*　\*　\*　\*

"The Court has the jurisdiction whereby we are called upon to punish people who do not comply with the ICC regulations. Also, there is a broad injunctive jurisdiction in this court against violations of ICC regulations. Therefore, this Court feels that insofar as this January 22nd lease can be comfort to either of these plaintiffs it would have to overcome the fact that this Court finds that it was drawn for the purpose of defeating the regulations which this Court is dedicated to seeing enforced. These regulations are in a large measure for the purpose of safety on the highways."

\*　\*　\*　\*　\*　\*

"In summary I should say that the judgment will be for the Insurance Company of North America, and an appropriate order may be prepared." (Emphasis supplied.)

From this opinion it will be seen that in dismissing the plaintiffs' case the District Judge made two critical findings. As the District Judge observes, the "factor" that gave him "the most concern is this lease, namely the one dated January 22, 1965, is that it is against public policy." He accordingly found that the lease, Exhibit 1, upon

which the plaintiffs' action is bottomed, was void as against public policy. Thereafter, upon the plaintiffs' motion for reconsideration, the District Judge changed his view on the public policy question. He said, "the Court is of the opinion that the pleadings and proof in this case do not support a determination of the case in favor of the defendant upon this ground [public policy]." We agree with this latter view of the District Judge. The appellee, however, urges us that, notwithstanding that illegality of Exhibit 1 was not pleaded and that no cross-appeal has been taken from the District Court's revised holding, we should now consider the question. We decline, believing that recognition of proper procedure forbids it, as does the substantive law. Wesson Oil participated in the making of Exhibit 1. It is not inherently illegal. If made so by statute, remedy for such illegality would be limited to the sanctions there provided. *Bruce's Juices v. American Can Co.*, 330 U.S. 743, 757, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947).

With the elimination of the "public policy" attack on the *continuing* validity of the January 22 short-haul lease, we consider the finding that the making in February or March, 1965, of the "long-haul" contract, back dated to January 1, 1965, cancelled or revoked the January 22 short-haul lease. We think that the District Judge's finding to that effect involved his resolution of mixed questions of law and fact. He said:

"There are several reasons, the proofs support several factors, *that kill the validity of this lease* [Exhibit 1]." (Emphasis supplied.)

He continued:

"In the first place, the essential elements of a lease are the thing, the price and the consent. Trial exhibit 1, or the short form lease, makes no reference to price. It does not even recite that the price will be the established price * * *."

He further supported his theory of cancellation by saying:

"When the parties executed the all inclusive lease for the same tractor, whether you call it by operation of the law or otherwise, they cancelled the prior lease in time."

The "all inclusive lease" mentioned was trial Exhibit 2, discussed hereinafter.

■ The fact that no price was written into the contract did not make the contract invalid, for parol evidence is admissible to supply such a term missing from a writing which does not purport to be the entire agreement between the parties. *Sky Chefs v. Pryor*, 38 Tenn.App. 443, 448, 276 S.W.2d 485 (1954); *Harris v. Morgan*, 157 Tenn. 140, 148–149, 7 S. W.2d 53 (1928); *First Nat'l Bank of Fayetteville v. Ashby*, 2 Tenn.App. 666 (1925). Both Russom and Wesson's traffic manager, Butt, testified that the price was set at 5½ cents per hundred pounds for hauls in the city, and that they were to agree on the price charged *per pound* for hauls outside of Memphis, substantially to conform to charges of certificated interstate truckers. This price was adhered to throughout all the time here involved. There seems to us little doubt that the writing of January 22, as understood in light of admissible parol evidence, constituted a valid contract covering short hauls.

The District Judge, however, finds that the signing of Exhibit 2—which he labeled a long form lease—was intended to cancel Exhibit 1, or in the alternative, possibly, that Exhibit 4, the letter formally cancelling Exhibit 2, also cancelled Exhibit 1. We can agree with neither view.

The terms of Exhibit 2 disclose to us that it was intended to cover a different subject matter than Exhibit 1. We read it as a *long-haul* contract and this is made clear by its provision that the rate or tariff to be charged was on a *mileage basis*—forty-five cents per mile; Wesson was to hire the drivers, pay their wages, social security taxes, and provide workmen's compensation coverage. All of the drivers were to meet the physical

qualifications specified by the Interstate Commerce Commission. Other provisions also indicate that Exhibit 2 was not intended to cancel Exhibit 1. No doubt it was prepared with a then entertained plan that Russom would become authorized to operate as an interstate carrier.

At trial, plaintiff Russom and Wesson Oil's former Traffic Manager, Butt, testified that while this Exhibit 2 was executed, no activities were ever carried on pursuant to its terms. It covered *long-hauls* only, to be paid for on a mileage basis. No *long-hauls* were undertaken, and no charges on a mileage basis were ever made by Russom. The foregoing testimony of Russom and Wesson Oil's Traffic Manager is uncontradicted. Such testimony is also supported by invoices rendered to Wesson by Russom, and gathered in trial Exhibit 5.

■ Furthermore, the parties who signed Exhibit 2 both testified that it was not intended to cancel the lease already in effect. Exhibit 2 was prepared by a lawyer, whom neither party called as a witness, although the parties stipulated that if he were called he would testify that he had drawn Exhibit 2, as well as the unsigned agreement, Exhibit 3. It would seem that if Exhibit 2 were to cancel Exhibit 1, a lawyer would include such intention in the new lease or in a separate instrument. The fact that a tractor described in Exhibit 2 was also described in Exhibit 1 is of no significance. The tank trailmobile, which was used exclusively for deliveries under Exhibit 1, was not described in Exhibit 2. Had operations ever commenced under Exhibit 2, there was no reason why a tractor described in Exhibit 1 could not also be used to make long hauls under Exhibit 2.

Wesson's Traffic Manager, Butt, was discharged in November, 1965.[1] Butt's successor, one Martin, testified that he never discussed any business with Butt when he took over, and asked no questions about leases or the terms upon which Wesson had been doing business with Russom. Martin testified that when he became aware of Exhibit 2—the long-haul agreement—he arranged with Russom some time in February, 1966, to cancel it. The cancellation of this long-haul agreement is evidenced by Exhibit 4, a letter back dated at the request of Wesson. If Exhibit 2 had ever been recognized as an uncancelled, enforceable contract, Wesson's potential liability under it was quite substantial. Exhibit 2 provided that Wesson was to employ Russom's vehicles for hauling its oil not less than 100,000 miles per year, per unit, at a charge of forty-five cents per mile. It is fair to infer that this fact motivated Martin's actions in removing all doubts as to the existence of Exhibit 2. Russom was willing to do this, never having provided any carriage nor made any demand for payment under Exhibit 2. Such Exhibit 2 was separate and distinct, and bore no relation to Exhibit 1.

Defendant's evidence, contesting the existence of Exhibit 1, was testimony by its manager, Martin, who succeeded Butt as Traffic Manager, and others at various levels of authority, that they did not know of and had not seen Exhibit 1 after its traffic manager, Butt, had been discharged. We do not consider such lack of knowledge, if true, of sufficient cogency to offset the unimpeached testimony of Russom and Wesson's agent, Butt, of the making of the contract, Exhibit 1.[2] Nor did it meet the uncontested

---

1. There was undisputed evidence that this discharge was because Butt had developed a drinking problem which led to failure to properly discharge his responsibilities. However, except as this misconduct might be urged as affecting Butt's credibility, his discharge and his drinking are of little relevancy to this contest.

2. We give no weight to testimony by Martin that following a discussion of cancellation of Exhibit 2, he asked Russom "if there were any other agreements between our company and himself in effect that he knew of and he said that he didn't know of any." Russom denied making this statement. Such "admission"

evidence that up to and after the fatal accident Russom was continuously performing and being paid for hauling for Wesson Oil, consistent with the written and verbal terms of a contract whereby Wesson agreed to provide liability insurance coverage for Russom.

■ In addition to the coverage agreed to be provided by Wesson Oil, Russom admittedly continued his own liability coverage for a time; it was dropped at its next expiry date coming during the course of his dealing with Wesson. There was proof that, after the Plunkett accident, Russom first contacted his own insurance company and then the insurors of the tractor he was using that day to haul the tank trail-mobile containing oil for Wesson,[3] and then got in touch with Wesson. We do not consider that these facts prove that Russom had agreed to any recission or termination of the short-haul lease, either by signing or cancelling the January 1, long-haul lease. Russom was a "wildcatter" and did not often exhibit much business acumen. His confusion following the Plunkett fatality does not evidence an intent to terminate the short-haul lease.

The insurance agent, through whom Russom had procured liability and other insurance coverage on his trucks, testified that Russom's liability insurance was dropped when the existing policy expired in July of 1965. Such insurance agent had solicited its renewal, and while the physical damage coverage was renewed in August, 1965, there was a notation in a letter to the theretofore liability carrier to the effect: "Wesson Oil is carrying the liability."

■ Tennessee law, which controls this diversity case, requires that the termination of a contract by mutual consent of both parties be positive, clear and

unambiguous, conveying an unquestioned purpose to terminate the contract. Bagwell v. Susman, 165 F.2d 412, 415 (6th Cir. 1947); Arkansas Dailies, Inc. v. Dan, 36 Tenn.App. 663, 671, 260 S.W.2d 200 (1953); Akers v. J. B. Sedberry, Inc., 39 Tenn.App. 633, 641, 286 S.W.2d 617 (1955).

■ We find that the contract, Exhibit 1, was in force at the time of the fatal injuries to Danny Plunkett. The District Judge's contrary conclusion, based on mixed findings of fact and law, is erroneous both as a matter of law and a matter of fact. At no time did Russom, or any agent of Wesson Oil, ever give their consent by any act or statement, let alone a clear and unambiguous one, conveying an unquestioned purpose to terminate the contract.

As the January 22 short-haul lease was in effect on the date of the accident, INA is obligated under the terms of its insurance contract with Wesson to bear the loss resulting from the accident, up to the full extent of the policy. The insurance policy issued to Wesson by INA provided in "Agreement V, Additional Insured; Definitions" as follows:

"In respect of the ownership, maintenance, existence or use of any automobile, the unqualified word 'insured' wherever used in this policy, includes not only the named insured but also (a) any person while using an owned automobile or hired automobile * * provided the actual use is with the permission, express or implied, of the named insured * * *.

"The provisions of the foregoing paragraph with respect to persons or organizations other than the named insured do not apply.

* * * * * *

"(b) with respect to any hired automobile or trailer, to the owner thereof

---

evidence is of "the weakest and least satisfactory character." 31A C.J.S. Evidence § 382a pp. 930, 931; IV Wigmore, § 1056, p. 17 (3rd Edition). The District Judge placed no reliance on it. Neither do we.

3. This tractor was owned by Russom and was being used that day because the tractor covered by the lease, Exhibit 1, was being repaired. However, the tank trailmobile containing Wesson's oil was the one covered by Exhibit 1.

or any employee of such owner; unless the insured is required by contract to provide coverage for such owner or employee thereof and then only to the extent that coverage is required under such contract and coverage is provided under this policy."

"Automobile" is defined, under the policy, to include "trailer". "Hired automobile" is defined as "an automobile used under contract in behalf of the named insured provided such automobile is not owned in full or in part by or registered in the name of" the named insured or its employee.

■■ Where there is a separate contract hiring or leasing a vehicle in addition to an agreement to haul a particular load, courts have held that the vehicle becomes a "hired automobile". Consolidated Mutual Ins. Co. v. Bankers Ins. Co., 244 Md. 392, 398, 223 A.2d 594, 598 (1966); Wostal v. Travelers Ins. Co., 239 F.Supp. 395 (S.D.Tex.1965); Citizens Mutual Automobile Ins. Co. v. Fireman's Fund Ins. Co., 234 F.Supp. 931 (W.D. Mich.1964). In accord with these cases, we hold that on the date of the accident the trailmobile was a "hired automobile."

The District Court found that Wesson did not in fact exercise control over the trailer or its driver and that Russom was an independent contractor. Such a finding has no bearing on the issue of INA's liability, for the trailer was a "hired automobile" as it was an "automobile used under contract in behalf of the named insured."

This Court recently stated, "The right to control equipment is generally regarded as the critical distinction between the 'hired automobile' and the 'non-owned automobile' for insurance contract purposes." Wolverine Ins. Co. v. State Automobile Mut. Ins. Co., 415 F.2d 1182 (1969). In the case at bar, Wesson having leased the trailer, had the *right* to control the trailer. The fact that Wesson failed to *exercise* that right of control is immaterial.

The judgment of the District Court is vacated with direction to enter a judg-ment in the amount of $17,500 in favor of Eugene Plunkett, with interest thereon from the date of such judgment, together with such attorney fees and other costs as the District Judge shall determine to be allowable.

This cause is remanded to the District Court for the foregoing purpose.