**Walter O. LANFRANCONI, Appellee,**

v.

**TIDEWATER OIL COMPANY, Appellant.**

**No. 195, Docket 30779.**

United States Court of Appeals Second Circuit.

Argued Nov. 22, 1966.

Decided April 7, 1967.

W. Edson McKee, Montpelier, Vt. (McKee & Clewley, Montpelier, Vt., on the brief), for appellant.

Edwin W. Free, Jr., Barre, Vt. (Davis, Martin & Free, Barre, Vt., on the brief), for appellee.

Before WATERMAN, MOORE and HAYS, Circuit Judges.

MOORE, Circuit Judge:

Plaintiff, Walter O. Lanfranconi, a former major and minor league baseball pitcher, entered into a partnership with Dante J. Domenichelli in 1953 to operate a service station at a strategic intersection in Barre, Vermont. They leased the station from defendant, Tidewater Oil Company (Tidewater). Although slow at the beginning, business developed through the hard work and long hours put in by the partners and by 1957 was

providing plaintiff with an annual income of over $7,000.00, as indicated by his federal income tax returns. In October 1959, plaintiff and Domenichelli entered into a new lease with Tidewater covering the period from December 15, 1959 to December 14, 1963. Under the terms of the lease, Tidewater could cancel at the end of six months or one year, but after that was committed to the full term unless the lessees failed to perform certain specified functions. The lessees, on the other hand, could terminate the lease jointly at any time upon thirty days' notice.

The first year of the new lease did not turn out to be as profitable for "Dan & Walt's," as the partnership was known, as in previous years with plaintiff's share of the profits for 1960 amounting to only a little over $4,500.00. Apparently, the two partners were experiencing a certain amount of hostility towards one another, with Domenichelli becoming increasingly upset over plaintiff's devotion to other interests (e. g., his family and occasional baseball scouting assignments) to the detriment of the service station business. Domenichelli's first outward ventilation of his concerns took place in January or February of 1961, when, after a sales meeting, he indicated to certain Tidewater representatives that he would like a station for himself. A Tidewater distributor salesman, present at the meeting, testified that Domenichelli was assured that if the partnership ever broke up he would get the station. By the beginning of June of that year, matters had not improved and Tidewater's Vermont manager suggested that Domenichelli alone should send in a letter "cancelling" the lease (the manager himself denied such action, but there was sufficient evidence below to support the conclusion that he did, in fact, solicit the letter). Domenichelli sent in a letter, pre-dating it to early May under the belief that this would speed up the termination of the lease. Plaintiff was then informed of the fact that the lease was "cancelled" and was asked to sign a mutual cancellation form provided by Tidewater. Under representations by the Tidewater distributor salesman that the lease was already terminated and that Tidewater would take over the station with neither plaintiff nor Domenichelli being allowed to continue operating the station, plaintiff signed the cancellation form thereby effectively ending the lease and the partnership. In fact, of course, Domenichelli's letter had been totally ineffectual to end the lease because the joint action of the two partners was necessary to effect termination. The lease terminated on June 30, 1961 and on the next day, July 1st, Domenichelli was installed by Tidewater under a new lease to operate the station alone in total contravention of plaintiff's expectations. There was evidence that the distributor salesman, in an effort to assure Domenichelli's continued possession of the station, had actually prevented the partners from settling their differences by persuading Domenichelli not to offer to sell his share of the partnership to plaintiff.

Plaintiff instituted this action against Tidewater on the theory that the latter had wrongfully interfered with the partnership and had thus hastened both the partnership's demise and the lease's untimely cancellation, and had damaged plaintiff's well-established reputation in the community (that plaintiff was well known in the community is attested to by the fact that he had been presented with a car by the City of Barre in 1947 in recognition of his baseball exploits), all to the great financial detriment of plaintiff. Plaintiff asked for compensatory damages to cover his loss of income from July 1, 1961 until the end of the lease's natural term on December 14, 1963, his loss of partnership profits and his injured reputation in the community. Punitive damages were also requested.

After a trial during which the above facts were developed, the court instructed the jury that, if the jury found that Tidewater had wrongfully, intentionally interfered in the partnership's affairs, it could award plaintiff damages for

loss of earnings, loss of his share of the partnership goodwill and damage to his reputation in the community. In addition, punitive damages could be awarded if the jury found defendant's conduct was motivated by "actual malice" which included "conduct manifesting nothing worse than reckless and wanton disregard of plaintiff's rights." The trial court did not specifically instruct the jury on Vermont partnership law, as requested by defendant, and thus failed to inform the jury that a partner can voluntarily discontinue a partnership at any time.

The jury returned a verdict of $55,000 —$20,000 in compensatory damages and $35,000 for exemplary damages. Tidewater's post-trial motions for judgment N. O. V., new trial or remittitur were denied and this appeal followed. We find the verdict to be grossly excessive, without basis on the record, with respect to both categories of damages. However, because we believe the jury could have reasonably found that plaintiff was injured by the wrongful conduct of defendant, we, in the interests of judicial expediency, will affirm upon the condition that plaintiff remit all but $7,500 compensatory and $5,000 punitive damages, leaving him a total verdict of $12,500. Should plaintiff not accept this condition within thirty days from the filing of this opinion, the judgment of the district court is reversed and the cause remanded for a new trial.

*The Jury's Verdict*

■ Any doubt that this Court has the power to review a trial court's exercise of discretion in refusing to set aside a jury verdict as excessive was dispelled by Dagnello v. Long Island RR., 289 F.2d 797, 798–806 (2d Cir. 1961), a case in which the excessiveness of the verdict was the only issue. However, where as here, the trial court in addition to allowing an excessive verdict to stand, in our opinion, improperly submitted a defamation issue to the jury upon which there was absence of proof, the jury award must be vacated.

The evidence adduced at trial is clearly insufficient to support an award of $20,000 in compensatory damages. There was evidence that plaintiff suffered some loss of earnings and that but for Tidewater's interference he might have realized more from the disposition of his share of the inventory and accounts receivable than he actually received in the eventual settlement worked out with Domenichelli. Each item of damages will be examined.

*Loss of earnings:* Plaintiff testified at trial that following his ouster on June 30, 1961, he was unemployed for some three months, worked as a camp supervisor at $60 per week for three weeks, after a short layoff spent eleven months as a bowling instructor at an average of $65 per week, and finally took over a Mobil Oil Company service station which netted him an average of $90 per week over the remainder of the relevant period. A rough calculation based on these figures yields total earnings of about $9,000 during the period from July 1, 1961 to December 14, 1963, the termination date of the lease and the first date at which Tidewater could have legally forced plaintiff out of the Dan & Walt's station.

Plaintiff's earnings from his partnership with Domenichelli for the five and one-half years prior to the lease cancellation, as indicated by his federal tax returns, were as follows: 1956—$4,994; 1957—$8,046; 1958—$7,392; 1959—$7,067; 1960—$4,529; first 6 months of 1961—$3,154. Plaintiff's average annual earnings for that period work out to be slightly under $6,400. Projecting that average over the just under two and one-half years remaining under the lease, plaintiff might reasonably have expected earnings totalling $16,000, whereas in fact he earned about $9,000. By his own testimony, therefore, plaintiff's loss of earnings amounted to roughly $7,000.

*Loss of appropriate share of inventory:* Upon termination of the partnership on June 30, 1961, the inventory was evaluated at $6,228, the partnership debts

were paid and the accounts receivable were transferred to Domenichelli. Plaintiff participated in these determinations through his counsel and an accountant and accepted a cash payment of $2,600 as full satisfaction of his share of the partnership. Plaintiff now contends in this suit against Tidewater that $2,600 was woefully inadequate as compensation for a half interest in the partnership as a going concern. At trial, when asked by his counsel to estimate the value of the inventory of materials and supplies at the time business ceased, plaintiff first answered, "I don't know, I can't say," but, when `pressed, estimated a value "between $10,000 and $15,000." At the end of his direct testimony, plaintiff estimated that the fair market value of his half-interest in the service station on June 30, 1961 was $10,000, although he admitted he had offered to sell his share to Domenichelli for $7,500. On the other hand, Domenichelli testified that the value of each partner's share in the business was $3,500 in June, 1961, this figure being based on the value of the partnership's equipment and cash. Domenichelli had offered that June to sell his share to plaintiff or to buy plaintiff's share for $3,500, but withdrew the offer upon the urgings of a Tidewater representative, who wanted Domenichelli to retain control of the station at all costs.

Plaintiff's estimate that his share of the business was worth $10,000 was based on the worth of the partnership as a going concern and was thus probably not limited to his share of the tangible assets, but included a share of the goodwill. But because plaintiff cannot recover compensation for loss of goodwill in this suit, as will be explained below, the inventory and other tangible assets must be evaluated alone. The best evidence of the value of the inventory is the bill of sale introduced below showing that plaintiff released his interest in the inventory for a payment of $6,228 by Domenichelli to the partnership account. After payment of partnership debts and a settlement of accounts receivable, plaintiff netted $2,600.

Whereas there is little basis for finding that $2,600 was an unreasonable settlement, it is possible that but for Tidewater's interference, plaintiff might have settled for $3,500 with Domenichelli. In any event, it is unlikely that plaintiff suffered damages in excess of $900 with respect to compensation for his share of the tangible partnership property, if he suffered at all.

■ *Goodwill:* Although there was evidence that plaintiff and Domenichelli had built up a respectable goodwill in operating Dan & Walt's from 1953–1961, this goodwill at most had value to the partnership for the remaining term of the lease only. By its terms, the lease could not be assigned and consequently the partners could not have sold their business as a going concern without defendant's consent. Furthermore, at the end of the lease, if defendant refused to renew, the goodwill would evaporate as an asset of the partnership—the successor operator being under no obligation to compensate the former partners. In fact, the only sure benefit that accrued to the partnership from its development of goodwill was an assurance of a steady business and income for the remainder of the lease term. Thus to allow plaintiff to recover both for loss of earnings and for loss of goodwill would be to allow for double recovery for one factor, namely, plaintiff's expectation of a steady income through December 14, 1963. The trial court erred in instructing the jury that it could award separate damages for loss of goodwill.

■ *Damage to reputation:* There was evidence that plaintiff had achieved a certain fame in Barre for his baseball exploits, but there was no proof that his reputation had suffered as a result of his business troubles with Tidewater. The trial court erred in submitting the question of defamation of plaintiff's character to the jury.

■ Reiterating, we feel that the jury's verdict of $20,000 compensatory damages is unwarranted on the basis of the record before us and cannot be allowed to stand.

■ *Punitive damages:* The trial court properly instructed the jury under Vermont law that punitive damages could be awarded if Tidewater's conduct manifested "a reckless and wanton disregard of plaintiff's rights." See Rogers v. Bigelow, 90 Vt. 41, 49, 96 A. 417 (1916). We are mindful of the rule that because punitive damages are incapable of precise determination, their assessment is "largely discretionary with the jury," Gray v. Janicki, 118 Vt. 49, 99 A. 2d 707, 709 (1953), Woodhouse v. Woodhouse, 99 Vt. 91, 130 A. 758 (1925), Rogers v. Bigelow, supra, and a jury award should be interfered with only if "manifestly and grossly excessive." Gray v. Janicki, 99 A.2d at 709. In *Rogers,* supra, the court found the award for exemplary damages to be grossly excessive and remanded the cause for a reassessment of damages unless the plaintiff filed a remittitur of the full amount of exemplary damages.

■ Whether there was sufficient evidence below to submit the question of punitive damages to the jury is a very close question. That Tidewater had a legitimate interest in the continued smooth operation of its service station cannot be disputed. To preserve basic service station standards, Tidewater's lease required the two partners to operate continuously 14 hours a day on weekdays and 13 hours on Sundays, to maintain adequate inventories and to keep the interior and exterior of the premises in a good and clean condition. The rent to be paid under the lease depended upon the number of gallons of gasoline pumped each month, although the lease is somewhat ambiguous on this point. There was evidence that prior to 1961, Tidewater was pleased with the performance of Dan & Walt's and considered it to be one of Tidewater's best stations. Thus, when trouble developed between plaintiff and Domenichelli in 1961, it was only natural for Tidewater to seek a resolution of the difficulties in order to preserve the success of the particular station. Nor, when the partnership appeared to be beyond saving, was it unnatural for Tidewater to seek to have the more efficient (in its opinion) operator of the two, Domenichelli, continue to operate the station. But the means chosen by the Tidewater distributor salesman and its Vermont manager to foster the company's interests cannot be condoned. Thus, the deliberate scheming with one partner to trick the other partner into cancelling the lease constituted a tortious act without regard for plaintiff's rights, going beyond the legitimate protection of Tidewater's legal interests under the lease. From the facts developed at the trial, the jury could have found some malice in Tidewater's conduct, justifying an award of some punitive damages. However, we are convinced that an award of exemplary damages of $35,000 was "manifestly and grossly excessive," *Gray,* supra, and must be set aside.

*Power to order remittitur:* Professor Moore has noted that, while remittitur practice has been criticized for being inconsistent with the Seventh Amendment's guarantee of a jury trial in civil cases, "its use has become so universal in the trial and even the appellate courts and has had the apparent approval of so many Supreme Court cases, that it cannot be contended that its use is unconstitutional without a judicial uprooting of precedent akin to that effected by *Erie-Tompkins.*" 6 Moore's Federal Practice ¶ 59.05 [3], at pp. 3738–40 (2d ed. 1965) (footnotes omitted). Professor Moore points out that appellate courts use remittitur in two general areas: (1) where reversible error is found in the proceedings below, but the court feels it can reasonably approximate the effect of the error on the size of the verdict below and, thus, conditions affirmance on the plaintiff remitting the portion of the verdict traceable to the error; and (2) where the excessiveness of the verdict alone is a ground for reversal, but the court grants the plaintiff the option of remitting the excessive portion or submitting to a new trial. 6 Moore ¶ 59.05 [3], at pp. 3749–51. The instant case covers both areas

for, in addition to being intrinsically excessive, the jury verdict below was also partly based on the erroneous submission of the issue of defamation to the jury.

The obvious advantage of remittitur practice is that, given a jury verdict that cannot stand, the plaintiff may believe it to be in his interest upon the law and facts to accept a lower amount of damages. The need for a new trial with its consequent delay and expense is thus averted. Plaintiff's right to a jury trial is not compromised as he has the option of seeking a new trial; defendant cannot complain as, in awarding excessive damages, the jury at least indicated that defendant should pay the maximum allowable damages and, in fact, the final verdict after remittitur may be below the latter amount. See 6 Moore ¶ 59.05 [3], p. 3745. Certain state appellate courts, notably New York, use remittitur practice widely with acknowledged success. See, e. g., Toomey v. Farley, 2 N.Y.2d 71, 156 N.Y.S.2d 840, 138 N.E.2d 221 (1906); Faulk v. Aware, Inc., 19 A.D. 2d 464, 244 N.Y.S.2d 259 (1st Dept. 1963), aff'd, 14 N.Y.2d 899, 252 N.Y.S. 2d 95, 200 N.E.2d 778 (1964), cert. denied, 380 U.S. 916, 85 S.Ct. 900, 13 L.Ed.2d 801 (1965). In *Faulk*, the Appellate Division, in reducing a punitive damage award of $1,250,000 against each of two defendants to $100,000 against the individual and $50,000 against the corporate defendant, commented: "It is the duty of the court to keep a verdict for punitive damages within reasonable bounds considering the purpose to be achieved as well as the mala fides of the defendant in the particular case." 244 N.Y.S.2d at 266. Cf. Roginsky v. Richardson-Merrell, Inc., 378 F.2d 832, n. 12 (2d Cir. April 4, 1967).

The federal courts have been considerably slower in adopting widespread remittitur practice. Nevertheless, this Court has conditioned affirmance of a verdict on remittitur, see Hill v. Long Island RR., 257 F.2d 736 (2d Cir. 1958) (in FELA action, jury found plaintiff 30 percent negligent, but did not indicate whether its finding of $45,000 damages took the 30 percent into account; held, plaintiff has option of accepting $45,000 less 30 percent or going to a new trial); Kendall v. United Air Lines, 200 F.2d 269 (2d Cir. 1952) (a diversity case, where it was not clear whether jury verdict included unauthorized 6 percent interest; reversed "unless the plaintiff agrees to a remittitur acceptable to the appellants."); cf. Moore-McCormack Lines, Inc. v. Richardson, 295 F.2d 583, 96 A.L.R.2d 1085 (2d Cir. 1961), cross petitions for cert. denied, 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526, 370 U.S. 937, 82 S.Ct. 577, 8 L.Ed. 2d 806 (1962) (admiralty award reduced); Alexander v. Nash-Kelvinator Corp., 271 F.2d 524 (2d Cir. 1959) (non-jury case). Other Circuits have sanctioned the use of remittitur under a variety of circumstances. See, e. g., Flame Coal Co. v. United Mine Workers, 303 F.2d 39, 97 A.L.R.2d 1136 (6th Cir., cert. denied, 371 U.S. 891, 83 S.Ct. 186, 9 L.Ed.2d 125 (1962)) (in case involving labor trouble, appellate court conditioned affirmance on remittitur of a substantial part of compensatory damages, while upholding the jury's award of punitive damages); Baldwin v. Warwick, 213 F. 2d 485 (9th Cir. 1954) (a diversity case remanded with directions for district court to order a new trial or "condition a denial thereof upon remittitur of an important percentage of the amount awarded as punitive damages."); Texas Co. v. Christian, 177 F.2d 759 (5th Cir. 1949) (appellate court, applying Alabaman law of punitive damages conditioned affirmance on remittitur of a portion of jury's general award representing both punitive and compensatory damages).

In requiring plaintiff to remit all but $12,500 of the total verdict, we have exercised our best judgment as to what amount should amply reimburse plaintiff for his actual losses as well as punish defendant for its wrongful conduct. $7,500 should cover plaintiff's actual

losses, whereas the scanty evidence on the maliciousness of Tidewater's conduct justifies an award of no greater than $5,000 punitive damages. Should plaintiff be dissatisfied with this total verdict of $12,500, he is, of course, free to seek a new trial.

Affirmed upon stated conditions.