Guilford **GLAZER**

v.

**Jerome S. GLAZER and Louis A. Glazer.**

**Civ. A. No. 10567.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Jan. 11, 1968.

See also D.C., 274 F.Supp. 471.

477

R. Emmett Kerrigan, Bernard Marcus, New Orleans, La., for plaintiff.

Harold R. Ainsworth, New Orleans, La., Alfred Moses, James C. McKay, Washington, D. C., for defendants.

RUBIN, District Judge.

## ORDER

This cause having been remanded to this Court for remittitur or, at the option

of the plaintiff, a new trial on the issue of damages; and the court having carefully considered the arguments of counsel as to the proper amount of the remittitur and the briefs submitted in support thereof; for the reasons attached hereto:

It is ordered that the verdict be set aside and that there be a new trial on the issue of damages, unless plaintiff enters a remittitur of $1,239,368, in which event judgment will be entered in the amount of $660,632.

## REASONS IN SUPPORT OF ORDER
### STANDARD APPLICABLE TO ENTRY OF REMITTITUR

The Court of Appeals remanded this case for remittitur or retrial on the issue of damages, not "merely because * * * the verdict is excessive in fact" but because "there were errors of law which can be corrected" only in this manner. 374 F.2d at 414. The Court's initial task is to determine the standard this Court should follow in fixing the amount of the remittitur.

■ The practice of granting a new trial because the verdict reached by the jury was excessive was well established at common law when the Constitution of the United States was adopted.[1] Therefore the use of this method to correct the error of the jury in arriving at a manifestly unjust verdict was not precluded by the Seventh Amendment since the scope and the meaning of that amendment are determined by "the appropriate rules of the common law established at the time of the adoption of that constitutional provision in 1791."[2]

But new trials are costly and time consuming. In this case, evidence was heard for a total of fourteen days. While a new trial would be restricted to the evidence relative to damages, even that trial would require several days. "To avoid this burden courts devised the practice of granting a new trial conditionally where the verdict was excessive"[3]—that is, they order a new trial to be held unless the successful litigant consents to the reduction or remission of damages to a specified amount.[4]

■ Since 1822, federal courts have held that a trial court, even after finding that the damages awarded in a prior trial were excessive, has the power to deny a motion for a new trial on condition that the plaintiff remit the excessive amount.[5] But only rarely have the courts themselves set forth in explicit terms the standard to be followed in fixing the amount of the remittitur.

■ Professor Moore, in his valuable treatise on federal practice, has set forth those cases in which a remittitur has been directed only with respect to that amount in excess of the highest verdict that a jury could have returned[6] and those in which the remittitur has been for everything in excess of the lowest amount that a jury could have reasonably found.[7] But as Professor Moore says, "the majority of the cases * * * disclose no such standards at all, but seem to fix the amount of the residue somewhere between these two extremes, i.e.,

1. The earliest reported case is Wood v. Gunston, 82 Eng.Rep. 863 (K.B.1655). See discussion in James, Civil Procedure 315, note 1 (1965), citing various English decisions. See also 6A Moore's Federal Practice ¶ 59.05[1].

2. Dimick v. Schiedt, 1935, 293 U.S. 474, 476, 55 S.Ct. 296, 297, 79 L.Ed. 603, and cases cited therein.

3. James, Civil Procedure 323 (1965).

4. E. g., Boldurian v. A/B Svenska Amerika Linien, E.D.Pa., 1965, 246 F.Supp. 413;

Huddleston v. Crain Brothers, Inc., W.D. Pa., 1960, 183 F.Supp. 874. See Whiteman v. Pitrie, 5 Cir., 1955, 220 F.2d 914, 919.

5. Blunt v. Little, 1822, Fed.Cas.No.1,578, 3 Mason 102, and discussion in Dimick v. Schiedt, 1935, 293 U.S. at 482–483, 55 S.Ct. 296. See discussion in James, Civil Procedure 323–324 (1965).

6. 6A Moore's Federal Practice 3743–3744.

7. Id. at 3743.

at a figure that the court believes a proper functioning jury should have found." [8]

The plaintiff urges that the "maximum recovery rule" was adopted by the Fifth Circuit in International Paper Co. v. Busby, 1950, 182 F.2d 790, 793, in which the court said:

> "Appellant's contention that the trial judge erred in allowing the verdict to stand to the extent of $5000 is without merit. It complains that the trial judge allowed the verdict to stand for the greatest amount the jury might have found from the evidence, whereas the amount should have been as small a sum as an impartial jury would properly have agreed upon from the evidence. This contention is unsound. The amounts awarded appellee for damages to his farming land, pastures, and livestock, for the loss of a crop for the year in question, and for the inconveniences caused by the presence of buzzards swarming over dead fish washed up in his yard, are not so excessive as to shock the conscience of this court, or even to persuade us that any injustice has been done appellant."

But it is apparent that the court did not in terms approve the "maximum recovery" standard. It said the appellant's contention was unsound; but the only words of approbation it used, and the only words suggestive of a standard, are that the amounts awarded "are not so excessive as to shock the conscience of this court, or even to persuade us that any injustice has been done."

However, in Butts v. Curtis Publishing Co., 5 Cir., 1965, 351 F.2d 702, 718–719, the court held that the trial judge had acted properly in entering a remittitur for the maximum amount of damages the jury could have allowed. The court considered it the trial judge's duty to review a verdict and to take appropriate action if it is too small or too large. The case involved an award for punitive damages, necessarily a matter for the determination of which, as the court observed, "there are, and can be, no precise standards," but with regard to which "a wide variance in the amounts * * * is inescapably inherent." 351 F.2d at 718. The trial court could therefore be guided only by what it felt a maximum permissible amount would be.[9]

These are the only Fifth Circuit cases that deal with the trial court's determination of the correct amount of the remittitur.[10]

---

8. Id. at 3745.

9. But see Country Mutual Insurance Company v. Eastman, 5 Cir., 1966, 356 F.2d 880, in which the court said that "Entry of an amended judgment for the round figure of $45,000 * * * cures the error * * *."

10. There are other Fifth Circuit decisions dealing with the standards applicable in the appellate court. In United States v. Certain Parcels of Land, 1945, 149 F.2d 81, the court said that as an appellate court it was "requiring a remittitur to the point above which the testimony would not sustain the verdict." 149 F. 2d at 83. Similarly when the court said, in Texas Company v. Christian, 1949, 5 Cir., 177 F.2d 759, that justice is done by entering a remittitur to the amount of the verdict that would be rendered "giving plaintiff's testimony as to losses * * * the fullest effect possible," 177 F.2d at 762, it was dealing with the standard to be followed by the appellate court when itself undertook to enter the remittitur. Judge Hutcheson clearly drew the distinction between the standard to be followed by an appellate court and the standard to be followed by a trial court in fixing a remittitur when, concurring in Sunray Oil Corp. v. Allbritton, 1951, 188 F.2d at 751, he said:
"Whether, in the opinion of the district judge, a verdict is excessive as matter of fact, that is, though not contrary to right reason and, therefore not excessive as matter of law, it is larger in amount than the judge thinks it justly ought to be, or is excessive as matter of law, that is, is so monstrous or inordinate in amount as to find no support in right reason, he has the same power, the same duty, in the one case as in the other to relieve against the excessiveness by granting a new trial or requiring a remittitur in lieu.
"The power and duty, on the other

In a number of federal cases in other circuits the "maximum recovery rule" appears to have been adopted. Thus, in Rice v. Union Pacific R.R. Co., D.C. Neb., 1949, 82 F.Supp. 1002, 1007, the court found that remittitur was warranted if "the portion of the verdict and judgment [is] found to be in excess of the highest appropriate recovery * * *." See also similar views in Tomljanovich v. Victor American Fuel Co., D.C.Me., 1915, 227 F. 951, 952; and Yurkonis v. Delaware, L. & W. R. Co., E.D.N.Y., 1914, 213 F. 537, 538.

The defendants cite several decisions that they contend leave the amount of a remittitur to the discretion of the trial court even though the result may be an amount *less* than the maximum jury verdict that would have been allowed. In Lanfranconi v. Tidewater Oil Co., 2 Cir., 1967, 376 F.2d 91, 97, the Second Circuit did point out in dicta that the defendant cannot complain of the remittitur practice as "in fact, the final verdict after remittitur may be below the [maximum allowable damages]." But it cited only Professor Moore in support of this observation. It went on to fix a remittitur itself, and stated that "we have exercised our best judgment as to what amount should amply reimburse plaintiff for his actual losses," 376 F.2d at 97, and it went on to observe that "the scanty evidence on the maliciousness of [the defendant's] conduct justifies an award of no greater than" the amount of punitive damages fixed by the court. 376 F.2d at 98.

The latter observation may be taken as an adoption of the maximum recovery view whenever the remittitur is based on excessiveness of the jury's award for the court said:

"Professor Moore points out that appellate courts use remittitur in two general areas: (1) where reversible error is found in the proceedings below, but the court feels it can reasonably approximate the effect of the error on the size of the verdict below and, thus, conditions affirmance on the plaintiff remitting the portion of the verdict traceable to the error; and (2) where the excessiveness of the verdict alone is a ground for reversal, but the court grants the plaintiff the option of remitting the excessive portion or submitting to a new trial." 376 F.2d at 96.

The case then appears to support the maximum recovery rule except where an appellate court is reversing only because of the trial court's error and where it thinks it can reasonably determine the extent of the error. The Fifth Circuit here found the jury verdict excessive, and in addition found error, and it obviously did not think it could "reasonably approximate the effect of the error on the size of the verdict below."

Defendant urges that the Ninth Circuit, in Carlstrom v. United States, 9 Cir., 1960, 275 F.2d 802, affirmed a remittitur entered by the trial court that resulted in · a judgment for less than plaintiff's evidence supported. But the issue whether this was correct was not raised, and the remittitur was agreed to. Nor does Muldrow v. Daly, 117 U.S.App.D.C. 318, 1964, 329 F.2d 886, furnish any guidance, for the court there, without discussing the standard to be followed, merely held that the evidence of record clearly provided support for the amount of the remittitur determined by the district judge.

Most important of all, the expressions of the United States Supreme Court furnish inferential support for the "maximum recovery" view. In Northern Pacific R.R. v. Herbert, 1886, 116 U.S. 642,

hand, of the Court of Appeals to relieve against excessiveness in verdicts does not extend to cases where the verdict is excessive merely as matter of fact. Limited as it is by the Seventh Amendment, its power and duty extend only to cases in which the verdict is excessive as matter of law, that is, is so gross or inordinate in amount as to be contrary to right reason."

646–647, 6 S.Ct. 590, 592, 29 L.Ed. 755, the Court approved as "a matter within the discretion of the trial court," a remittitur "of so much of the damages as, in its opinion, the jury had improperly awarded."[11] And in Dimick v. Schiedt, 1935, 293 U.S. 474, 476, 55 S.Ct. 296, 79 L.Ed. 603, the Court said of the action of the Court of Appeals that it had "recognized the doctrine, frequently stated by this court, that in the case of an excessive verdict it is within the power of the trial court to grant defendant's motion for a new trial unless plaintiff remit the amount deemed to be excessive * * *." Thus, to the extent that the authorities provide any guidance, the Court concludes that they seem to favor the maximum recovery rule.

The Court also believes that the maximum recovery rule is preferable as a matter of policy.

■ Where damages are either liquidated or can be determined by the application of fixed rules to any given set of facts, a verdict for more than the amount of damages that would be allowable under a correct computation is wrong as a matter of law and should be set aside.[12] However, in many instances the damages are to be measured in whole or in part by the jury's discretion. This is the situation where recovery is sought for a personal tort, where punitive damages are allowed, or where as here the amount of damages depends in part on what is a reasonable term for a contract. In such cases, the fixing of damages is an integral part of the jury's function.[13]

■ By definition in these situations, the legal rules governing the amount that should be awarded as damages allow a wide discretion to the jury. A trial court's power to direct a new trial is a part of its duty to superintend the proper functioning of the jury and in its exercise of this power a court must necessarily allow the jury to exercise the range of discretion entrusted to it by the law. Any rule that attempts to define the court's function should remind the court "of the breadth of the jury's sphere."[14]

In respecting this sphere some courts say they will set aside a verdict as excessive only if it is so large as to be the result of passion, bias or prejudice.[15] Others suggest that the criterion for determining if the award should be set aside is whether it is so excessive as to shock the court's conscience.[16] Still others look to a combination of these and other factors.[17] A somewhat less esoteric standard was suggested by Judge Learned Hand when he concluded that "The trial judge decides what verdict is within the bounds of reasonable inference from the evidence."[18]

11. See also Neese v. Southern Ry., 1955, 350 U.S. 77, 76 S.Ct. 131, 100 L.Ed. 60.

12. James, Remedies for Excessiveness or Inadequacy of Verdicts, 1 Duquesne Law Review 143 (1963).

13. Id. at 144.

14. Id. at 146.

15. E. g., Occidental Consolidated Mining Co. v. Comstock Tunnel Co., C.C.D.Nev., 1903, 125 F. 244. Where a verdict results from passion or prejudice a new trial should be granted and remittitur is not proper. Brabham v. State of Mississippi, 5 Cir., 1938, 96 F.2d 210, 213 and cases there cited. See also 3 Barron & Holtzoff (Wright ed.) § 1305.1, p. 375.

16. E. g., Huddleston v. Crain Brothers, Inc., W.D.Pa., 1960, 183 F.Supp. 874; Lebeck v. Crain Operating Co., E.D.Pa., 1956, 145 F.Supp. 706.

17. E. g., Graling v. Reilly, D.D.C., 1963, 214 F.Supp. 234 (Holtzoff, D. J.) ; Wanamaker v. Lewis, D.D.C., 1959, 173 F.Supp. 126; Marchant v. American Airlines, D.R.I., 1956, 146 F.Supp. 612.

18. Miller v. Maryland Casualty, 2 Cir., 1930, 40 F.2d 463, 465. See also, e. g., Lebeck v. William A. Jarvis, Inc., 3 Cir., 1957, 250 F.2d 285, 288; Jamison v. DiNardo, Inc., W.D.Pa., 1961, 195 F.Supp. 99; Elliot v. United States Steel Corporation, W.D.Pa., 1961, 194 F.Supp. 936; United States v. 64.88 Acres of Land, W.D.Pa., 1960, 25 F.R.D. 88.

The latter standard seems preferable. A mere reference to vague expressions about conscience-shocking amounts does not furnish the enlightenment that the public should expect from its judges about how they arrive at their decisions. The problem of determining whether a new trial should be ordered on the basis of the excessiveness of a verdict is not so subjective as to prevent the formulation of standards to be used in the exercise of the Court's power. Nor should judges have the unfettered latitude for decision that might be afforded by calculated imprecision of the rules that they themselves have formulated.

■ The same standard that guides a court in deciding that a verdict is so excessive as to require a new trial should guide it in determining the amount of remittitur. The remittitur device was adopted to correct the injustice of an excessive verdict without the necessity of a new trial. Its function is to take the place of a new trial when the jury has arrived at a verdict that would allow a court to order a new trial. Therefore, the same respect for the "breadth of the jury's sphere" should be required in figuring the amount of remittitur as in determining whether a new trial should be granted on the basis of an excessive verdict.

Moreover, it seems to this Court that reduction of the verdict only to the highest amount that the jury could properly have awarded is "the only theory which has any reasonable claim of being consistent with the Seventh Amendment." [19] For it appears to be at least partially on this theory that the United States Supreme Court justified the constitutionality of the remittitur practice in Dimick v. Schiedt, 1935, 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603, in which it observed, at page 486, 55 S.Ct. at page 301, that:

"Where the verdict is excessive, the practice of substituting a remission of the excess for a new trial is not without plausible support in the view that what remains is included in the verdict along with the unlawful excess—in that sense that it has been found by the jury—and that the remittitur has the effect of merely lopping off an excrescence."

■ In proceeding to fix the remittitur, then, the Court will be guided by the principle that the plaintiff who has been awarded an excessive amount by one jury should have the option of taking the maximum amount that the jury could properly have awarded or of taking a new trial before another one. In determining this, it appears proper first to fix the amount that this Court thinks a properly functioning jury would have awarded, and this may be merely another way of saying that the starting point is the amount of damages the Court itself thinks proper on the record under the mandate of the Court of Appeals. After that, the maximum recovery rule requires the Court to determine the maximum amount of deviation from that verdict that could be allowed without requiring a new trial. Such a formulation is particularly apt here where the claim is for breach of contract, even though some of the questions to be resolved in fixing quantum in this case—such as the duration of the contract, which, the mandate instructs, is to be for a reasonable term—are imprecise.

## METHOD OF COMPUTING REMITTITUR

■ After the defendants removed Guilford Glazer from office, they caused Glazer Steel Corporation to enter into contracts with them increasing their salaries and bonuses. A resumé of the aggregate salaries and bonuses paid each

19. 3 Barron & Holtzoff (Wright ed.) § 1305.1, p. 376. This also is the view taken by Professor James, who says that any other practice "seems to be a clear invasion of the jury's sphere," James, Civil Procedure 326 (1965).

defendant after plaintiff's removal until three (3) months prior to the time of trial, for each fiscal year ended July 31, is as follows:

|  | Salary | Bonus | Total |
|---|---|---|---|
| 1960 | $ 52,676 | $14,350 | $ 67,026 |
| 1961 | $ 52,000 | $ 9,380 | $ 71,380 |
| 1962 | $ 69,600 | $ 4,803 | $ 74,403 |
| 1963 | $ 69,600 | $ 4,803 | $ 74,403 |
| Total paid to each Defendant | $253,876 | $33,336 | $287,212 |

This includes nothing for the reasonable value of the sickness and disability benefits or death benefits provided under their employment contract entered into after the breach of the plaintiff's contract, or for the value of other fringe benefits provided the defendants by Glazer Steel Corporation. Without anything for these benefits, the annual average compensation paid to each defendant was $71,803.

Neither the salaries nor the bonuses paid Guilford Glazer prior to the breach of the contract were the same as those paid his brothers. When the contract sued on was signed, Guilford's salary was about 17% more than the salaries paid Jerome and Louis and bonuses were paid in the ratio of 6% to Guilford and 4% each to Jerome and Louis. The jury awarded damages for breach of the contract, and the Court of Appeals concluded that the "jury could find that the contract as a whole created rights to the continued compensation the plaintiff claims in his action." 374 F.2d at 402. The Court of Appeals also expressly found that the salaries and bonuses had been paid "in close proportion to the brothers' stockholdings in" Glazer Steel Corporation, 374 F.2d at 397, and said that the jury could (as it apparently did) find that "the brothers had chosen Glazer Steel, the strongest and most profitable of their businesses, as the one that would pay salaries and serve as the focal point of their extensive operations." 374 F.2d at 403.

The defendants urge that their compensation was increased after Guilford Glazer was discharged because of the added responsibilities they assumed, but it is idle to suppose that the so-called compensation paid the three brothers by Glazer Steel had ever been based solely on their responsibilities. The payment of salaries, bonuses, and fringe benefits to the three brothers by Glazer Steel had served not only to compensate for their services, but it had also been the vehicle by which they shared the benefits of corporate ownership. The contract they made among themselves provided that they should receive "such salaries, bonuses, and dividends as the Board (sic) of Directors of the corporations shall authorize and declare." Thus, Guilford would not be restricted to the salary and bonus he was receiving in October, 1959. If their past practice was followed, all of the brothers would have received compensation changes simultaneously. It is proper therefore to measure the damages Guilford Glazer suffered in proportion to the amounts of salary and bonus actually paid his brothers after the breach of their contract with him, rather than by the amounts paid to him before the breach.

If Guilford had received the same proportionate increase in salary that Louis and Jerome received (17% more salary and 50% more bonus than each), he would have received $347,028 during the four-year period ended July 31, 1960, 1961, 1962, and 1963. Had the corpora-

tion been paying this sum, it would have been paying a total of 24½% of its net profits in bonuses rather than 14%, but Louis and Jerome elected to increase the bonus paid each of them to 7% and they should not be permitted to avoid a corresponding increase to Guilford.

Guilford Glazer has filed a stockholder's derivative action challenging the validity of various corporate actions by Glazer Steel including the reasonableness of the salaries and bonuses paid Louis and Jerome Glazer. His position there is to some extent inconsistent with the award here sought; but, as things now stand, the defendants have caused Glazer Steel to pay them the amounts set forth in this opinion, and the award to Guilford Glazer can be based only on what they have actually done. If the payment to plaintiff of the amounts fixed in the Court's order in this case creates a defense or offset in the derivative action, that is a matter to be pleaded there.

The annual base figure, then, by which damages are to be measured is $86,757.

## DURATION OF CONTRACT

In order to establish the amount of the remittitur, a reasonable period must be fixed for the duration of the stockholders' contract. The Court of Appeals said that the contract might have been construed to provide for compensation (a) for a reasonable time; possibly (b) until the death of any one of the brothers; or (c) until the "complete retirement" of one of the three brothers. 374 F.2d at 404. There is no evidence in the record concerning the life expectancies of the brothers, nor is there any reliable evidence about the dates on which they might expect to retire completely. In October, 1959, Louis Glazer was 40 years old; Guilford Glazer was 38; and Jerome was 35. Considering the ages of the parties; the factors set forth in the opinion of the

Court of Appeals; the analogy of the agreement to a voting trust, the term of which is limited in both Tennessee and Louisiana to ten (10) years;[20] the testimony of Guilford Glazer that he thought it was reasonable to assume the contract would last ten (10) years; and all of the other circumstances set forth in the record; I find that a reasonable period for the duration of this agreement would have been ten (10) years from the date it was entered into. The contract was violated on October 7, 1959. Its duration from that time would have been 8 years and 84 days, or 8.23 years.

The basic amount of damages is therefore $714,010 (8.23 times $86,757).

## MITIGATION OF DAMAGES

Guilford Glazer was paid a total of $18,000 a year from Shelbourne Towers, Inc. and Colonial Village Corporation in 1960 and 1961. He could have been paid an equal amount in 1962 and 1963 had he elected to cause the corporations to pay it. He was also paid $23,352 by Glazer Steel Corporation for the fiscal year ended July 31, 1960. Credit is given for these sums.

Guilford Glazer's so-called "salary" from Ark Bowling Lanes (his wholly-owned corporation) is not considered in mitigation, because he did not render any services to this corporation other than those performed when his contract with Glazer Steel Corporation was in existence. The contract of December 30, 1957, expressly provided that it did not "restrict or prohibit either of the parties from undertaking or engaging in outside ventures * * *."

The plaintiff had a duty to mitigate damages, and this duty requires the damages to be reduced not merely by what he actually earned but also by what he reasonably could have earned had he chosen to work.[21] It is true that the

---

20. Tenn.Code § 48–316; LSA–R.S. 12:33.

21. This is clearly the rule in Tennessee. Akers v. J. B. Sedberry, Inc., 1955, 39 Tenn.App. 633, 286 S.W.2d 617; Godson v. MacFadden, 1931, 162 Tenn. 528, 39

S.W.2d 287. See also News Publishing Co. v. Burger, 1911, 2 Tenn.C.C.A. 179; Congregation of Children of Israel v. Perez, 1866, 42 Tenn. 620. If the Court is to apply Louisiana law, the same result should be reached. The Court of Appeals

Court of Appeals said, "The defendants concede that the burden is on them to show in mitigation of damages what income, *if any*, Guilford Glazer *received* as a result of relief from performance of the contract." 374 F.2d at 413 (Emphasis supplied.) But this statement is directed at the burden of proof and was not, as I read it, intended to suggest that Guilford Glazer might have sat idle, chosen to receive nothing in salary *eo nomine* regardless what opportunities for employment he might have had, and collected the equivalent of what would otherwise have been his full compensation from his brothers.

It has been shown that Guilford Glazer was employed as president of the Holly Corporation and could have continued in that capacity but resigned because, he testified, it would have required "enormous effort" on his part. He received 50,000 shares of Holly Corporation stock having a value of $100,000 through his wholly-owned corporation, Downtown Management. This is not altogether "salary" although it did apparently involve some compensation for services rendered in assembling the properties involved. The sum of $80,000 was paid Oak Ridge Properties, Inc. as reimbursement of expenses. This also is not "salary" but the payment of this sum was obviously at least partially in compensation for Guilford Glazer's personal efforts.

The plaintiff could structure certain of his income in the manner that suited him best for personal, business and tax reasons. Whether the amounts paid as a part of certain transactions was labeled "salary" or something else is not therefore determinative of its character. The receipt of the substantial sums involved in the Holly Corporation–California land transaction demonstrates, as indeed the entire record in this suit shows, that Guilford Glazer was a man of great acumen, ingenuity, and resourcefulness, and that he could readily earn substantial sums in the time he would otherwise have devoted to the affairs of Glazer Steel Corporation.

It is true that the presidency of Glazer Steel did not require all of Guilford Glazer's time and that his contract with his brothers permitted him to engage in other profitable affairs. It is nevertheless irrefutable that the affairs of Glazer Steel and its related enterprises required a substantial portion of his time and that the breach of the contract by the defendants freed him from these demands.

What Guilford Glazer did in fact earn is not fully shown by the record nor is there direct evidence of what he could have earned. But it is, I think, reasonable to estimate that, in addition to the amounts he actually received from Shelbourne and Colonial, he could readily have earned $30,000 a year (½ of his former salary as president of Glazer Steel Corporation) in the time he would otherwise have spent on its affairs had he chosen to work for some other firm as an executive. While the burden is on the defendants to prove the amounts that

concluded there was a duty to mitigate damages and thus presumably decided either that Tennessee law applied, or that in applying Louisiana law LSA–C.C. Art. 2749 was not applicable in this case. In the absence of LSA–C.C. Art. 2749, the rule in Louisiana appears to require, as it clearly does in Tennessee, that damages be reduced in an amount equal to what the plaintiff reasonably could have earned had he chosen to work. See Bancroft v. Indemnity Insurance Co. of North America, W.D.La., 1962, 203 F. Supp. 49, 54; Gremillion v. C & L Construction Co., La.App. 3 Cir., 1960, 125 So.2d 198, 200; Noland v. Liberty Mutual Insurance Co., La.App. 1 Cir., 1957, 96 So.2d 360, 362; Mossler Acceptance Corporation v. Naquin, La.App. 1 Cir., 1947, 31 So.2d 247, 248; Mutual Rice Co. v. Star Bottling Works, 1927, 163 La. 159, 111 So. 661, 663. See generally Restatement, Contracts § 336, Comment d. Thus, plaintiff's damages must be reduced by a figure representing this amount.

should be offset in mitigation of damages, I think they have borne the burden to this extent.  Therefore, I find the plaintiff's damages, as mitigated, to be:

| | | |
|---|---|---|
| Basic Amount | | $714,010 |
| Credits: | | |
| Glazer Steel Corporation | $ 23,352 | |
| Salaries earned or that could have been earned from Shelbourne and Colonial for 8.23 years | $148,140 | |
| Salaries that could have been earned elsewhere at $30,000 a year | $246,900 | $418,392 |
| | | $295,618 |

The damages are not to be reduced in relationship to Guilford Glazer's stock ownership in Glazer Steel Corporation. Assuming that corporation's income continues at the amounts indicated in the record for prior years, approximately ½ of any sum *not* paid to Guilford Glazer would be paid in income taxes, and his net equity· in the corporation would be increased by only ½ of any such sum. In addition, the retention of these amounts would increase only the book value of his stock, not its market value. Market value of corporate stocks seldom reflects book value.  The benefit Guilford Glazer would derive from this retention is too remote and speculative for it to be used as an offset.

Neither should Glazer Steel Corporation be joined as a party (even if this should at this stage lie within the Court's power) nor should the judgment provide that the corporation may pay it.  Glazer Steel is not a defendant and it is not charged with a breach of the plaintiff's contract.  The defendants made a stockholders' agreement with their brother; they have been found ·to have violated it; and it is they who should respond in ·damages.

■■■■ Plaintiff urges that interest on the amount of judgment should be allowed from the date of judicial demand. In determining the amount, if any, of interest to be awarded, the Court must look to the Louisiana conflict of laws rules.  Klaxon Co. v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477.  The generally held view appears to be that the rate of interest allowed as part of the damages for breach of contract is determined by the law of the place of performance of the contract.  See, e. g., Restatement, Conflict of Laws § 418; Leflar, The Law of Conflict of Laws § 129 (1959).  But see Ehrenzweig, Conflict of Laws § 195 (1962); McCormick, Handbook on the Law of Damages § 2 (1935).  Compare Restatement (Second), Conflict of Laws, Tentative Draft No. 6, § 346d, § 332, § 332b (1960).  Presumably the same conflict of laws rule should apply in determining when interest should begin to run.

■■■ While no recent cases have been cited or found in which the issue is discussed, the early Louisiana cases indicate that Louisiana follows the general rule, Lapice v. Smith, 1839, 13 La. 91; Bent v. Lauve, 1848, 3 La.Ann. 88, 90; Ballister v. Hamilton, 1848, 3 La. Ann. 401, in awarding interest for breach of contract.  Thus, this Court should look to the law of Tennessee in determining the rate of interest that should be assessed and the time interest should begin.

It is clear under Tennessee law that the allowance of interest in cases involving unliquidated damages for breach of contract is within the discretion of the trial judge. Thayer v. Wright Co., 1961, 50 Tenn.App. 515, 362 S.W.2d 805, 812. However, Textile Workers Union v. Brookside Mills, Inc., 1959, 205 Tenn. 394, 326 S.W.2d 671, makes clear that the court's discretion under Tennessee law to grant interest in such cases is limited to cases in which "the amount of the debt is certain and not disputed on reasonable grounds." 326 S.W.2d at 675. Here the amount of the debt cannot be said to be settled. Interest prior to the date of judgment must therefore be denied.

The contract was made on December 30, 1957. Assuming that it was to run for ten (10) years, all sums computed above would have been due by December 30, 1967. Therefore there is no prepayment for the future, and no discount is allowable.

This award allows the plaintiff nothing for the damages that he may have suffered by virtue of the loss of his right to participate in corporate control and management. There is no evidence in the record on which to base a judgment concerning a proper amount for this if any damages for this item are indeed properly allowable in this suit.

### MAXIMUM AMOUNT

The areas in which a jury might reasonably have awarded more than the amount fixed in this calculation are:

(1) The value of the sickness and disability and death benefits provided by contract, and the value of the fringe benefits afforded Louis and Jerome but not Guilford. These might fairly be estimated by a jury as being worth a maximum of $5,000 per year.

(2) The duration of the contract. The jury might reasonably have arrived at a term of fifteen (15) years for the contract.

(3) Mitigation of damages. The jury might reasonably have concluded that Guilford Glazer could reasonably be expected to earn only $20,000 a year in addition to the other sums credited.

Adjusting what would have been the Court's own award to reflect these amounts and thus to arrive at the maximum verdict the Court would approve, we reach the following:

| | |
|---|---:|
| Court's idea of a proper award | $295,618 |
| 5 additional years at $86,757 | $433,785 |
| 15 years disability, death and fringe benefits | $ 75,000 |
| Reduction in mitigation of damages 8.23 years at $10,000 | $ 82,300 |
| | $886,703 |
| Less mitigation of damages for 5 additional years ($18,000 a year from Shelbourne Towers and Colonial plus $20,000 a year) | $190,000 |
| | $696,703 |

That part of this sum that would have been earned after January 1, 1968, must now be discounted at the rate of five (5%) per cent [22] for 5 years (roughly to value on January 1, 1968). This reduces the total award under the "maximum recovery" rule by $36,071 to $660,632.

22. Current interest yields on U. S. Government bonds convince me this is a reasonable rate.