264

Douglas T. MARGREITER, Plaintiff,

v.

NEW HOTEL MONTELEONE and Liberty Mutual Ins. Co., Defendants.

Civ. A. No. 76–3745.

United States District Court,
E. D. Louisiana.

June 25, 1979.

Ralph S. Whalen, Jr., Oestreicher & Whalen, New Orleans, La., for plaintiff Margreiter.

A. R. Christovich, Jr., Christovich & Kearney, New Orleans, La., for defendant New Hotel Monteleone.

PALMIERI, District Judge.*

The plaintiff in this personal injury action was awarded a verdict of $750,000 after a bitterly contested five-day jury trial. That verdict is now the subject of contention. The defendant has moved for a judgment notwithstanding the jury verdict or, alternatively, for a new trial, or for a *remittitur.* The plaintiff has cross-moved for entry of judgment on the verdict with interest from the date of judicial demand.

The personal injuries for which the plaintiff sued resulted from a bizarre set of circumstances never fully explained because of the plaintiff's alleged impairment of memory resulting from his injuries.

Shortly after 2 a. m. on April 7, 1976, the plaintiff was taken to Charity Hospital by two New Orleans policemen who had found him in a lamentable condition—smelling of alcohol, his chest and shoulders covered with vomit, lying face down on the ground in a parking lot in the French Quarter of New Orleans. He appeared to have been drinking and to have been injured. At the hospital, the plaintiff's watch, his hotel room key, and a small sum of money were found on his person. Neither the police nor the hospital personnel were able to ascertain the plaintiff's name or any other information from him. In an effort to establish his identity through the hotel room key, a hospital employee telephoned the

* The Honorable Edmund L. Palmieri, Senior District Judge for the Southern District of New York, sitting by designation.

night clerk of the defendant hotel. The call established his identity and led to an immediate search of the plaintiff's room, which was found to be tidy and undisturbed, the bed made up and unused.

The plaintiff had registered as a guest at the defendant New Hotel Monteleone several days earlier, on April 2, 1976, arriving from Denver, Colorado, to attend a pharmaceutical convention. He had been a guest there on a prior occasion and was accompanied by two friends attending the same convention. They were assigned to separate rooms on the same floor. The sixteen-story hotel, which had six hundred rooms, was fully occupied. Mr. Margreiter was assigned to a single room and bath on the fifth floor.

The account the plaintiff related to the jury of what occurred on the night of April 6–7, 1976, is based on his partial and possibly fantasized recall of the events and is substantially what follows. On the evening of April 6, 1976, Margreiter and his two companions had had dinner and made a brief visit to a night club; Margreiter then took leave of the others. One of them, Peebles, retired to a room immediately adjoining Margreiter's. Only a few minutes later, two black men entered his room unannounced, by use of a key. Margreiter had not secured the door with the chain lock because he expected Bogan, his other companion, to visit him. It was about 10 p. m. One intruder had a club, the other a pistol.

The two men who entered the room said nothing, either upon their entrance or at any later time. The plaintiff was struck a heavy blow on the head, causing him to fall to his knees. He shouted, tried to break his fall, and struggled with one or both of the men. One man put his hand over Margreiter's mouth. He was walked or dragged out of his room, and out of the hotel, by way of an elevator (apparently a freight elevator which normally has an operator) through a room with pots and pans (apparently a kitchen) through a double door (apparently a rear door used by hotel employees where a guard is normally stationed) and into an alleyway. Margreiter remembered seeing the word "hombre" on a door.[1] At the trial, Margreiter testified he felt quite certain that one of the men was a hotel employee who had repaired the air conditioner in his room. It does not appear that any criminal complaint was ever lodged by Margreiter, a puzzling circumstance considering that he testified that he had said, "I know you. Get out," to one intruder, and yet could not

1. Margreiter's reiterated testimony regarding this detail led to a sharp factual controversy at the trial. The defendant's last witness was Richard Condon, Jr., an employee of the defendant who had been a sergeant instructor with an eighteen-year career in the New Orleans Police Department. He testified that he was familiar with the French Quarter and that only one establishment there had the word "hombre" on a door in April, 1976, and that was the Las Casas Bar and Lounge, where the word appeared on the door to the men's room. After his testimony, both sides rested, and a schedule was agreed upon for the closing addresses of counsel and the jury instructions on the next day.

Before the morning session began, however, counsel for Margreiter sought and obtained permission, over the strenuous objection of defense counsel, to reopen his case to present a rebuttal witness, Paul Bernard Dietrich. Dietrich testified that he ran the Las Casas Bar in April, 1976, and that it never had "hombre" on a door, but a sign with the word "men," which he took to another bar in the French Quarter. It was developed from his testimony that some years before, the bar in question was called "Las Casas-Las Marinas" and had had a Spanish-speaking patronage. Since this bar was less than one-half block from the parking lot where Margreiter was found on the morning of April 7, 1976, the possible inference that he had been in this bar that night turned on whether the bar was the location of the door labeled "hombre." Because of Margreiter's memory impairment, his recollection may have been mistaken only as to the time he saw the sign, as he had been a visitor to New Orleans on a previous occasion.

describe him. From the time of the alleged attack in the plaintiff's room and his exit from the hotel until he was found in the parking lot some three and a half hours later, there is no evidence in the record as to his movements or whereabouts. The parking lot was three to four blocks from the rear door of the hotel in the French Quarter, an area generally frequented by tourists and known for its considerable nighttime activity.

The plaintiff's story, coupled with the few undisputed facts relating to the time and place of the parking lot episode, gave rise to a series of closely contested factual issues. The plaintiff has never been able to give a detailed description of either of the men who entered his room. No witness to the plaintiff's forced exit from the hotel was ever found despite the ebb and flow of many guests and employees. There was no evidence that any of his belongings were taken from his room or his person. At one point, the plaintiff told the hotel's chief security officer James (who died after being deposed before the trial) that three men (not two) had entered his room. Both the experienced police officers who picked the plaintiff up at the parking lot and the emergency staff at Charity Hospital noted that he was intoxicated, but the plaintiff testified he drank very little for reasons of health. It could be surmised from the plaintiff's injuries—a fractured skull, broken teeth, a fractured left ankle, and multiple bruises—that he had been severely beaten. The hard core issue in the case was whether any part of the injuries had been inflicted in his hotel room as he claimed and, if so, whether any negligence with respect to the hotel's security system was responsible.

On April 7, 1976, Margreiter transferred to the Hotel Dieu Hospital in New Orleans as the private patient of Dr. R. C. Llewellyn, a distinguished neurosurgeon, who testified at the trial. Although Margreiter was sleepy, disoriented, and confused at the outset, Dr. Llewellyn found Margreiter to be alert and oriented after three days. Dr. Llewellyn last saw him on April 14, 1976, when Margreiter was discharged and permitted to fly back to Denver, where his medical problems were placed in the hands of other doctors.

Overhanging the plaintiff's account was the medical possibility that his injuries caused him to have a recall of fantasies, of events that actually never took place. Dr. Llewellyn testified to this possibility. Additionally, Dr. Llewellyn testified that the plaintiff's injuries would not be consistent with an appearance of intoxication.

The plaintiff's account was disputed on numerous factual grounds. The thrust of the defendant's attack was to demonstrate the high degree of implausibility of plaintiff's story. In the defendant's view, the plaintiff had left the hotel, became intoxicated, and gotten himself into a fracas of his own making under circumstances completely extraneous to his relationship to the hotel. The plaintiff's contention was that he had been beaten by intruders in his hotel room and abducted from the hotel and that his injuries, inflicted by the intruders, were causally related to the defendant hotel's negligence in failing to take reasonable precautions for the safety of its guests.

The plaintiff's testimony and the plaintiff's credibility were painstakingly litigated. While this court would not have arrived at the same factual conclusions as the jury on the issue of liability because of the inherent implausibility of the plaintiff's testimony with respect to the events of April 6 and 7, 1976, it is constrained to respect the jury's verdict and permit it to stand. The crucial role played by the plaintiff's credibility in this case was carefully explained to the jury in the court's charge. The jury's answers to the questions put to them, which

are reproduced in the margin,[2] demonstrate a careful adherence by the jury to the court's instructions. Despite the implausible circumstances surrounding the plaintiff's assault and abduction from his hotel room, the issue boiled down to whether the jury could accept the plaintiff's testimony. The verdict indicates that it did, and this court cannot permit its own assessment of the facts to constitute grounds for setting it aside. "[I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *Boeing Company v. Shipman,* 411 F.2d 365, 375 (en banc) (5th Cir. 1969).

The issues of damages must be viewed differently, however. Totally apart from the circumstances just discussed, there is no doubt that the case was tried and put before the jury by the plaintiff in a manner best calculated to provide the highest possible recovery. In his opening address to the jury, plaintiff's counsel said he was seeking a recovery of $2,256,000. Substantially more than half the body of proof consisted of medical evidence or evidence relating to plaintiff's injuries and alleged damages. The plaintiff called four doctors to the witness stand (an orthopedic surgeon, a neurosurgeon, a neurologist, and a psychiatrist) and read from the depositions of three additional doctors (an ophthamologist, an orthopedic surgeon, and a neurosurgeon) and a dentist. He also called an economic expert who based his opinion of future wage loss of substantially more than $500,000 upon plaintiff's total and permanent disability—a premise refuted by plaintiff's own testimony and that of two of his medical witnesses, Dr. James A. Lewis, a neurologist, and Dr. Carl J. Getto, a psychiatrist. Both these doctors testified that Mr. Margreiter could return to work and that it would be better for him if he did. It should be noted, parenthetically, that plaintiff resigned from his position, that he was not compelled to leave it, and that his superior officer was disposed to retain him. Dr. Lewis further testified that Mr. Margreiter had suffered much less impairment of mental function than he would have guessed from his complaints; and that on a scale of one to ten he would classify his mild mental impairment at only two. It appeared to be undisputed that plaintiff could still work at other jobs in the Colorado Civil Service or outside of it, that he would still be entitled to receive a substantial retirement pay, and that he had, in fact, since the injuries complained of, traveled to distant cities to attend conventions. He was, as a trial witness, a remarkably poised, self-possessed individual. As he had no family dependents and lived at the time with a male companion,

2.           UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| DOUGLAS T. MARGREITER | CIVIL ACTION |
| VERSUS | NO. 76–3745 |
| NEW HOTEL MONTELEONE, ET AL | SECTION "G" |

1. On April 6, 1976 was the Monteleone Hotel negligent in failing to exercise reasonable care to protect the plaintiff against injury by third persons?

            YES  X
            NO __

NOTE: If your answer is NO, return to the Courtroom.
If YES, proceed to next question.

2. Was that negligence a proximate cause of any injury to plaintiff?

            YES  X
            NO __

NOTE: If your answer is NO, return to Courtroom.
If YES, proceed to next question.

3. Was plaintiff negligent or contributorly [sic] negligent?

            YES __
            NO  X

NOTE: If your answer is YES, answer question 4;
If NO, proceed to question 5.

4. Was such negligence or contributory negligence a proximate cause of his injuries?

            YES __
            NO __

NOTE: If your answer is YES, return to the Courtroom.
If NO, proceed to next question.

5. What, if any, are the damages, stated in dollars, incurred by plaintiff.

            $750,000.00

            Larry H. Faulk
               FOREMAN

March 30, 1979

who presumably shared his expenses, there appeared to be no dire need for the payment of high damages.

In sum, the recovery here was shockingly exaggerated and beyond any reasonable consonance with the plaintiff's case considered as a whole. The evidence was clearly insufficient to establish the plaintiff's permanent and total disability. It is indeed surprising to find in plaintiff's papers on this motion a suggestion that the jury could have justifiably reached such a conclusion. The impact of the plaintiff's own evidence was that he could and should return to work and was quite capable of doing so. A finding of total and permanent disability would be inconsistent with such evidence. It is this court's considered opinion that the maximum award which the evidence will support is the sum of $400,000. *See Gorsalitz v. Olin Mathieson Chemical Corp.,* 429 F.2d 1033, 1047 (5th Cir. 1970), *adopting Glazer v. Glazer,* 278 F.Supp. 476, 478–82 (E.D.La.1968), and cases cited therein.

The defendant is directed to submit proposed order of *remittitur* on notice. The Clerk is directed to amend the judgment entered on April 9, 1979 to provide that legal interest will accrue from date of judicial demand.

United States District Court,
E. D. Pennsylvania.